512 F.2d 956
 10 Fair Empl.Prac.Cas. 105, 9 Empl. Prac.
Dec. P 9980,
168 U.S.App.D.C. 42
 Alfred E. DAVIS et al., George Harley and John D. Sellers, Appellants,
v.
Walter E. WASHINGTON, Individually and in his capacity as
Commissioner of theDistrict of Columbia, et al.
 No. 72-2105.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 23, 1974.
Decided Feb. 27, 1975.
 
 Richard B. Sobol, Aldie, Va., with whom George Cooper, Richard T. Seymour and Ralph J. Temple, Washington, D. C., were on the brief for appellants.
 David P. Sutton, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief for appellee Washington.
 Douglass J. McCollum, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, John A. Terry, Asst. U. S. Atty., were on the brief for the federal appellees. Earl J. Silbert, U. S. Atty., also entered an appearance for federal appellees.
 Before McGOWAN, ROBINSON and ROBB, Circuit Judges:
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 On behalf of all blacks who have unsuccessfully sought appointment to the District of Columbia Metropolitan Police Department since 1968, appellants intervened in this class action[1] to assert the claim that Test 21, a written entrance examination administered to all applicants, discriminates against blacks in violation of the Due Process Clause of the Fifth Amendment and federal civil rights laws.[2] The District Court con cluded that Test 21 was nondiscriminatory in design and operation and was "reasonably and directly related to the requirements of the police recruit training program."[3] The court entered summary judgment for the defendants, appellees here,[4] and this appeal followed.[5] We hold that appellants have demonstrated on the record that Test 21 has a racially disproportionate impact,[6] and that appellees have not met their heavy burden of showing that the test is related to job performance.[7] Accordingly, we reverse the summary judgment and remand for further proceedings.
 
 I. THE APPLICABLE LEGAL STANDARD
 A. The Facts
 
 2
 Applicants are appointed to positions in the Metropolitan Police Department if they satisfy character and physical standards, have a high school diploma or the equivalent, and receive a raw score of 40 or above on Test 21.[8] The test was developed by the Civil Service Commission for general use throughout the federal service as a measure of verbal ability, rather than specifically to measure the full range of skills required to perform the tasks of a police officer.[9] The Department was not involved in the formulation of Test 21.
 
 
 3
 Appellants tendered to the District Court statistical evidence purportedly demonstrating that Test 21 has a disproportionate impact on black applicants. Among the applicants tested in the District of Columbia from 1968 through 1971, 57% of the blacks failed the test, as compared to a failure rate of 13% for whites.[10] Although black applicants thus failed Test 21 at a rate more than four times greater than the rate for whites, appellees dispute the capability of these statistics to prove a racially disproportionate impact. They further contend that, regardless of the sufficiency of this evidence, Test 21 can be used in selecting police officers because it is sufficiently job related. In support of the latter proposition, they offer a validity study[11] conducted under the auspices of the Civil Service Commission demonstrating, they claim, that scores on Test 21 accurately predict performance in Recruit School, the Department's police training program.
 
 B. The Griggs Standard
 
 4
 In Griggs v. Duke Power Co.,[12] the Supreme Court considered the legality of standardized intelligence tests under Title VII of the Civil Rights Act of 1964.[13] "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance," the Court said, "the practice is prohibited."[14] Once it is shown that a particular selection procedure has an exclusionary effect on minority applicants, there is a heavy burden on the employer to show that discriminatory procedure "bear(s) a demonstrable relationship to successful performance of the jobs for which they were used."[15] In the instant case, if appellants' evidence is sufficient to show an exclusionary impact on black applicants, and we hold that it is,[16] then the Department must shoulder the heavy burden of justifying Test 21 by demonstrating that results on the test are satisfactorily related to successful performance of the job of a police officer.
 
 
 5
 The District Court ruled that appellants' showings (a) that the number of black police officers in the Department is not proportionate to the population mix of the District, (b) that a higher percentage of blacks fail Test 21 than whites, and (c) that Test 21 has not been validated to show its reliability for measuring job performance, shifted the burden of proof to appellees.[17] We reach the same conclusion on the basis of the racially disproportionate impact that Test 21 is shown to have.[18] The District Court further ruled, however, that Test 21 is exonerated by a direct and reasonable relationship to the requirements of the Department's police training program.[19] We deem that insufficient, and finding Test 21 not otherwise demonstrated to be job related, we hold that appellees have not met their burden.[20]
 
 
 6
 II. THE RACIALLY DISPROPORTIONATE IMPACT OF TEST 21
 
 
 7
 The evidence in the record establishes that the percentage of black failures on Test 21 is far greater than white failures.[21] The cases hold, and we agree, that evidence establishing that significantly more blacks than whites fail a written entrance examination given to all applicants is sufficient, as a matter of law, to show the racially disproportionate impact of the examination.[22] The disparity disclosed in this case-more than four to one-is larger than differences held sufficiently disproportionate in other cases.[23] Indeed, absent evidence revealing some other reason for the lopsided failure rates appearing here, it is difficult to imagine how disproportionate effect could ever be better demonstrated.
 
 
 8
 The District appellees contend that the court could properly find that appellants had not made the necessary showing simply by considering the relationship between the percentage of blacks in the Metropolitan Police Department and the percentage of black population in the community.[24] They assert that other courts have been more concerned with that type of information than with pass-fail rates. Our research discloses, however, that population data have been considered judicially for only two purposes. There are a number of cases that have held population data alone sufficient to show racially disproportionate impact, but in the apparent absence of data on pass-fail rates.[25] Other courts have noted population data merely to corroborate a showing of racially disproportionate impact based on pass-fail rates.[26] There is no authority-and we decline to provide any-for the proposition that proof of a racially disproportionate impact must encompass both pass-fail rates and disparate population figures. We think the precedents establish that either demonstration is legally sufficient to shift the burden of establishing job relatedness to the employer.[27]
 
 
 9
 Appellees also urge us to consider the affirmative efforts of the Metropolitan Police Department to recruit black officers. We think such efforts are irrelevant to the issue-the discriminatory effect of Test 21 itself. The employer's lack of discriminatory intent was deemed irrelevant by the Supreme Court in Griggs ; "Congress directed the thrust of the (Civil Rights) Act to the consequences of employment practices," the Court admonished, "not simply the motivation."[28] Other courts have held that an employee challenging an employment practice as discriminatory need not prove a purpose on the employer's part to discriminate;[29] the only intent requirement is that the employer consciously perform the allegedly discriminatory act.[30] Thus it has been expressly held, and we agree, that effortS to recruit minority members have no bearing on a showing that an employment practice has a racially disproportionate impact.[31] Although the Department, quite commendably, has succeeded in increasing the proportion of black officers through vigorous efforts, it is self-evident that use of selection procedures that do not have a disparate effect on blacks would have resulted in an even greater percentage of black police officers than exists today.[32]
 
 
 10
 The evidence this case lays bare is further corroborated by the "substantial body of evidence that black persons and other disadvantaged groups perform on the average far below the norm for whites on generalized intelligence or aptitude tests."[33] Judicial decisions on the "ever-extending series of challenges to civil service examinations"[34] unequivocally establish that blacks are test-rejected more frequently than whites.[35] This phenomenon is the result of the long history of educational deprivation, primarily due to segregated schools, for blacks.[36] Until arrival of the day when the effects of that deprivation have been completely dissipated, comparable performance on such tests can hardly be expected.
 
 III. JOB RELATEDNESS OF TEST 21
 
 11
 As a result of appellants' showing that Test 21 has a disproportionate racial impact, there is a heavy burden on appellees to prove that the examination bears a demonstrable relationship to successful performance as a member of the Metropolitan Police Department.[37] Appellees contend that they have met this burden by establishing a direct relationship between applicants' scores on Test 21 and recruits' average scores on examinations given in the Department's Recruit School.[38]
 
 
 12
 We are compelled to view the evidence presented by appellees in that regard with some skepticism. The assertion of predictive value of Test 21 for achievement in Recruit School is based upon a correlation between Test 21 scores and scores on written examinations given during a 17-week training course. We think this evidence tends to prove nothing more than that a written aptitude test will accurately predict performance on a second round of written examinations, and nothing to counter this hypothesis has been presented to us.[39] But despite serious doubt as to the probative value of the evidence,[40] we are willing to assume for purposes of this appeal that appellees have shown that Test 21 is predictive of further progress in Recruit School. The ultimate issue in this controversy then becomes whether that kind of proof is an acceptable substitute for a demonstration of a direct relationship between performance on Test 21 and performance on the job.
 
 
 13
 Appellees assert that their validity study[41] establishes that Test 21 is predictive of "trainability," and that therefore the examination survives the Griggs standard. Appellants, on the other hand, have convincingly argued that the record evidence does not demonstrate a sufficient relationship between Test 21 scores and trainability. All entrants into Recruit School pass the final examinations with a grade of 70 or above; if a particular candidate has difficulty, he is given assistance until he succeeds in passing the examinations.[42] The validity study revealed that persons with high Test 21 scores are more likely to achieve a final average exceeding 85 in Recruit School,[43] but there is no evidence to support the proposition that a candidate with an average below 85 is more difficult to train or will not be as good a police officer as a candidate with an average over 85.[44] Moreover, since applicants who scored below 40 on Test 21 have never been admitted to Recruit School, the validity study expressed no conclusion regarding the likely performance in Recruit School of Test 21 failures.[45] For these reasons, and because of the departmental policy that nobody fail Recruit School,[46] appellees have not shown that the admission of applicants who score below 40 on Test 21 into Recruit School would necessitate expanded training time[47] or produce Recruit School failures.[48] We might add that the Recruit School averages apparently have not been used by the Department for any purpose other than the attempt to validate Test 21 in this case.[49] The Griggs standard does not, in our opinion, permit validation by a criterion that the employer itself does not believe sufficiently job related.
 
 
 14
 Appellees maintain that there is support for their position in applicable legal precedents.[50] Claims similar to that have been made before, and the reported decisions on the point have uniformly rejected a correlation between entrance examination performance and training performance as a means of validating the entrance examination.[51] In a typical case, involving a written entrance examination given by the Philadelphia Police Department,[52] it was contended that the examination accurately predicted performance in the Department's Police Academy, as reflected in scores on Academy final written examinations.[53] The court refused to find the entrance test in that case job related for several reasons. There was no correlation between Academy performance and effective job performance;[54] there was no showing that the Academy examinations were significantly different from the entrance exams, so the correlation might merely have indicated that the entrance examination predicated good scores on a second written test;[55] and there was no showing that applicants who failed the entrance examination would not do well in the Academy.[56] As further support for its conclusion, the court noted that no one had failed in the Academy in the past five years.[57] The similarity between that case and the case at bar is indeed striking, and the same result has been reached by at least three other courts.[58]
 
 
 15
 Appellees further argue that convincing proof that an employment selection procedure, even one with a racially disproportionate impact, accurately predicts trainability might in some cases satisfy the Griggs standard.[59] Appellees have not, however, proffered such proof, nor have they persuaded us that trainability could be a proper criterion for validating Test 21. As long as no one with a score below 40 enters Recruit School, as long as all recruits pass Recruit School, as long as the Department's actions concede that Recruit school average has little value in predicting job performance, and as long as there is no evidence of any correlation between the Recruit School average and job performance, we entertain grave doubts whether any of this type of evidence could be strengthened to the point of satisfying the heavy burden imposed by Griggs.
 
 IV. CONCLUSION
 
 16
 The dissent is concerned, as are we, with preservation of the Department's ongoing efforts to improve its professional standards.[60] The District Court declined to read the controlling legal principles so that "brakes (would) be placed upon efforts to upgrade recruiting and job standards in law enforcement work."[61] The court apparently believed that the relief sought by appellants would necessarily lower recruitment standards and produce "a setback for blacks and whites alike."[62] We believe these fears are not well founded. Elimination of Test 21 could result in lower standards only if it were job related, and appellees have not come forward with satisfactory evidence that Test 21 is job related. The common sense theory of validity espoused by the dissent is clearly an inadequate response to appellants' proof of racially disproportionate impact.[63] The rationale is equivalent to a finding of construct validity without satisfying the prerequisites delineated in Douglas v. Hampton.[64]
 
 
 17
 Appellants' complaint sought both declaratory and injunctive relief. They are, as a matter of law, entitled to a declaration that Test 21 is invalid, and the conclusions we reach have in other cases served as the basis for enjoining the administration of entrance examinations and ordering affirmative relief.[65] The focus here, however, has been on the substantive issues, and the record lacks the factual development essential to a sound determination as to whether an injunction against use of Test 21 is warranted. We leave that question open to consideration by the District Court, mindful that declaratory relief in accordance with this opinion might, in consequence of agreement by the parties or otherwise, obviate any need for the coercion of an injunction.[66]
 
 
 18
 The judgment of the District Court is reversed. Appellants' motion for partial summary judgment must be granted,[67] and appellees' respective motions for summary judgment denied.[68] The case is remanded to the District Court for entry of appropriate orders, and determination and effectuation of a suitable remedy, in harmony with this opinion.
 
 ROBB, Circuit Judge (dissenting):
 
 19
 I would affirm the judgment of the District Court on the opinion of Judge Gesell, reported as Davis v. Washington, 348 F.Supp. 15 (D.D.C.1972). I add a few words.
 
 
 20
 The majority finds that Test No. 21, designed to measure verbal ability, is invalid because it is not "job related"; but the majority does not discuss the content of Test No. 21. To remedy this omission I attach a copy of the 1970 test, which is in the open record before us (J.A. 145), as an appendix to this dissent. The record also discloses (J.A. 46) that a passing rating of 70 is achieved if forty of the eighty questions are answered correctly.
 
 
 21
 As I see it, the premise of the majority opinion is either that Test No. 21 is not a fair test of the verbal ability required of a policeman, or that verbal ability is not related to a recruit's performance in the Police Academy and thereafter as a policeman. I disagree on both counts.
 
 
 22
 As the District Court recognized, modern law enforcement is a highly skilled professional service. In school and thereafter in practice a policeman must learn and understand intricate procedures. He must understand a myriad of regulations, statutes and judicial rulings, and he will be called upon to apply them in his daily work. He must be able to present relevant facts in literate, clear and precise reports. When he testifies in court he must be articulate. He cannot achieve these goals unless he has a basic understanding of the English language and the meaning of words and the ability to perceive the import of written sentences. In short, issuing a badge and a gun to a semi-literate cannot transform him into a competent police officer. As the district judge put it "(t)he ability to swing a nightstick no longer measures a policeman's competency for his exacting role in this city." 348 F.Supp. at 17.
 
 
 23
 In my judgment Test No. 21 on its face is a fair and reasonable test of the ability of a police recruit to measure up to the qualifications I have outlined. In other words, I think it is "job related" on its face. Certainly I cannot believe that one who fails to answer half of the questions correctly has the verbal ability and understanding to qualify for admission to the Police Academy and thereafter for membership in the Police Department. Although the majority rejects this reasoning, which it rightly calls a "common sense theory", I adhere to the conviction that common sense in a judicial decision is not out of place.
 
 
 24
 The majority notes that the disproportioate rate of failure among blacks "is the result of the long history of educational deprivation, primarily due to segregated schools for blacks." That this should be true is deplorable, but it does not follow that one who cannot pass the test is qualified to become a police officer.
 
 
 25
 Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), much relied upon by the majority, involved tests, for admission into the Coal Handling, Operations, Maintenance and Laboratory and Test Departments of a public utility. The Court found that the tests were not "directed or intended to measure the ability to learn to perform a particular job or category of jobs", (401 U.S. at 428, 91 S.Ct. at 852,) and that they were therefore invalid. I think the distinction between those tests and jobs and the test and job in our case is obvious. The job of a policeman is quite different from the jobs involved in the Griggs case. Test No. 21 is intended to measure the ability to fulfill the duties of a policeman and I think it fairly does so. Perhaps it would not fairly measure ability to succeed in coal handling for a public utility, but that is not its purpose.
 
 
 26
 We are often told by knowledgeable commentators and critics that the standards for admission to membership in the Police Department must be raised and maintained at a high level. I agree with this proposition. In my judgment the majority opinion is a step backward that will lead to debasing the quality of our police force.
 
 I respectfully dissent.APPENDIX
 
 27
 Test No. 21.
 
 Series No. 173
 February 1970
 
 28
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 UNITED STATES CIVIL SERVICE COMMISSION
 
 29
 Fill in the identifying blanks at the top of the answer sheet and test booklet. Place no other identifying marks on your answer sheet and test booklet.
 
 
 30
 The questions in this test need not be taken up in order. Answer first those that you can answer without any delay. Then use the remainder of the time on the questions you have passed over.
 
 
 31
 For each question, select the BEST ANSWER, and darken the space on the answer sheet that bears the same letter as the answer.
 
 1. ORDINARY means most nearly
 A) uncommon
 B) worthless
 C) usual
 D) tiresome
 E) lasting
 
 32
 2. SMILE is related to HAPPINESS as FROWN is related to
 
 A) surprise
 B) ridicule
 C) face
 D) displeasure
 E) inquiry
 
 33
 3. Laws restricting hunting to certain regions and to a specific time of the year were passed chiefly to
 
 
 34
 A) prevent people from endangering their lives by hunting
 
 B) keep our forests more beautiful
 
 35
 C) raise funds from the sale of hunting licenses
 
 
 36
 D) prevent complete destruction of certain kinds of animals
 
 
 37
 E) preserve certain game for eating purposes
 
 
 38
 4. The saying "All things are easy that are done willingly" means most nearly
 
 
 39
 A) Work undertaken without reluctance proceeds smoothly.
 
 
 40
 B) To the lighthearted all things are easy.
 
 
 41
 C) Many hands make light work.
 
 D) Easy things are done willingly
 
 42
 E) Everyone likes a cheerful worker.
 
 5. PECULIARLY means most nearly
 A) calmly
 B) stubbornly
 C) wonderingly
 D) sensibly
 E) strangely
 
 43
 6. (Reading) "Dates are the fruit of a species of palm tree which ranges from the Canary Islands through northern Africa and the southeast of Asia to India. These trees have been cultivated and their fruit much prized throughout most of these regions from remotest antiquity. In Arabia date palms are an important source of national wealth, and their fruit forms the staple article of food in the country."
 
 
 44
 The quotation best supports the statement that date palms
 
 
 45
 A) are the chief source of wealth in many countries
 
 
 46
 B) have long been valued as a source of food
 
 
 47
 C) were first grown in the Canary Islands and Africa
 
 
 48
 D) were not prized for their fruit in early times
 
 
 49
 E) cannot be grown in other than tropical climates
 
 
 50
 7. SKETCHING is related to PEN as PHOTOGRAPHY is related to
 
 A) brush
 B) camera
 C) picture
 D) pose
 E) studio
 
 51
 8. The best reason, of the following, for requiring that ballots be marked in secret is that
 
 
 52
 A) this provides for a permanent record of results
 
 
 53
 B) the results are thus unknown until voting is over
 
 
 54
 C) the vote is intended to indicate the real opinion of the voterD) this permits several matters to be voted on at the same time
 
 
 55
 E) this is the established custom of our country
 
 GO ON TO NEXT PAGE
 
 56
 (End of page)
 
 9. BOUNTY means most nearly
 A) generosity
 B) limit
 C) service
 D)fine
 E) duty
 
 57
 10. Strands of fiber used in a rope are twisted or braided
 
 
 58
 together chiefly inorder to make the rope
 
 A) more flexible
 B) less expensive
 C) unbreakable
 D) more rigid
 E) stronger
 
 59
 11. CANOE is related to PADDLE as STEAMSHIP is related to
 
 A) wharves
 B) propeller
 C) water
 D) routes
 E) yard
 
 60
 12. The saying "No gains without pains" means most nearly
 
 
 61
 A) Progress is made only at the expense of effort.
 
 
 62
 B) The lazy man rarely reaches his goal.
 
 
 63
 C) One cannot always be certain that results will justify his efforts.
 
 
 64
 D) Achievement without toil deserves little appreciation.
 
 
 65
 E) To plan one's work is to hasten its completion.
 
 13. The purpose of trademarks is to
 A) show that a tax has been paid
 
 66
 B) distinguish the brand of goods manufactured
 
 C) show that a patent has been granted
 D) indicate that goods are unadulterated
 E) distinguish home from foreign products
 14. CRISP means most nearly
 A) broken
 B) frosty
 C) brittle
 D) burnt
 E) dry
 
 67
 15. (Reading) "The practical skill of primitive man became, in time, quite admirable in the treatment of certain kinds of disease and even more so in surgery. Examples of his accomplishments may be seen today, among primitive tribes, and, together with prehistoric remains, testify to the status of medicine before history was written."
 
 
 68
 The quotation best supports the statement that primitive man
 
 A) lacked knowledge of surgery
 
 69
 B) exhibited more skill in medicine than in surgery
 
 C) was not easily affected by disease
 
 70
 D) developed a definite skill in dealing with physical ailments
 
 E) buried complete records of his ability
 
 71
 16. WEED is related to PLANT as FLY is related to
 
 A) screen
 B) disease
 C) insect
 D) food
 E) spider
 
 72
 17. The saying "A drowning man will catch at a straw" means most nearly
 
 
 73
 A) Help sometimes comes after we have abandoned all hope of it.
 
 
 74
 B) Great effort is necessary to overcome great difficulties.
 
 
 75
 C) He who relies on too slim a chance is lost.
 
 
 76
 D) A man will try anything as a last resort.
 
 
 77
 E) No disaster is entirely without remedy.
 
 SCARCELY means most nearly
 A) minutely
 B) fittingly
 C) partially
 D) precisely
 E) barely
 
 78
 19. (Reading) "A great many small mammals, and not a few of considerable size, have developed the arboreal habit. Most climbing forms have taken to the trees for food, and perhaps even more important, to escape terrestrial enemies which would readily overcome them had they not evolved climbing habits. The only entirely tree-living mammals, however, are confined to the tropics."
 
 
 79
 The quotation best supports the statement that tree-living mammals
 
 A) are afraid to descend to the ground
 
 80
 B) have to be small to find sufficient food in trees
 
 C) damage trees by consuming the leaves
 
 81
 D) developed climbing habits as a matter of necessity
 
 E) are confined to small, tropical animals
 
 82
 20. GARDEN is related to FLOWER as LAKE is related to
 
 A) pool
 B) river
 C) beach
 D) cottage
 E) fish
 21. PERTURBED means most nearly
 A) agitated
 B) distrustful
 C) impelled
 D) repulsed
 E) unmoved
 
 83
 22. The saying "To believe a thing impossible is a way to make it so" means most nearly
 
 
 84
 A) It is unwise to begin what is beyond one's ability.
 
 
 85
 B) The only way to prove a thing can be done is to do it.
 
 
 86
 C) We can do whatever we think we can do.
 
 
 87
 D) What is easy to obtain is not worth having.
 
 
 88
 E) Lack of confidence leads to failure.
 
 
 89
 23. SPEAK is related to SHOUT as DAMAGE is related to
 
 A) sue
 B) repay
 C) destroy
 D) condemn
 E) repair
 
 90
 24. (Reading) "Men who have good mechanical ability, and especially those who have had some experience in mechanical work, will, when they show their worth, be detailed as helpers in machine shops and engine rooms, where opportunity will be given them for acquiring training with machinists' tools."
 
 
 
 09,09
 The quotation best supports the statement that the qualifications for helpers in machine shops and engine rooms must include
 
 
 
 91
 A) the demonstration of mechanical ability or training
 
 B) special experience in mechanical work
 C) training with machinists' tools
 D) Previous apprenticeship on the job
 E) similar duties in previous positions
 
 92
 25. Of the following reasons, the one that best explains the continued sale of records in spite of the popularity of the radio is that the
 
 
 93
 A) records make available the particular selections desired when they are desired
 
 
 94
 B) appreciation of records is more wide-spread than appreciation of radio
 
 
 95
 C) collection of records provides an interesting hobby
 
 D) newest records are almost unbreakable
 
 96
 E) sound effect of records is superior to that of the radio
 
 
 97
 26. The saying "The fire in the flint shows not till it is struck" means most nearly
 
 
 98
 A) One should be prompt to recognize one's opportunities.
 
 
 99
 B) The first attempt is not always successful.
 
 
 100
 C) Unless abilities are demonstrated, they remain unrecognized.
 
 
 101
 D) There is a proper time for everything to be done.
 
 
 102
 E) Only by repeated efforts can skill be achieved.
 
 
 103
 27. ISOLATION is related to COMPANIONSHIP as DESPAIR is related to
 
 A) despondencyB) success
 C) strength
 D) recovery
 E) hope
 
 104
 28. The saying "Straight trees are the first to be felled" means most nearly
 
 
 105
 A) Honest effort is always rewarded.
 
 
 106
 B) The best are the first chosen.
 
 
 107
 C) Ill luck passes no one by.
 
 
 108
 D) The highest in rank have farthest to fall.
 
 
 109
 E) The stubborn are soon broken.
 
 
 110
 29. SUN is related to HEAT as FOG is related to
 
 A) moisture
 B) twilight
 C) storm
 D) winter
 E) evening
 
 111
 30. (Reading) "The Pure Food and Drugs Act would be totally incapable of enforcement were it not for the fact that chemists have perfected methods of investigation whereby the claims of composition of various foods and drugs can be verified or exposed. The Government has an ever-watchful force of 'chemist detectives' trying to protect the Nation's health in respect to remedies sold to the public."
 
 
 
 09,09
 The quotation best supports the statement that Government chemists
 
 
 
 112
 A) prosecute violators of the Pure Food and Drugs Act
 
 B) improve the quality of foods and drugs
 C) discourage the sale of patent medicines
 
 113
 D) tests the chemical composition of foods and drugs
 
 
 114
 E) have considerably improved the health of the Nation
 
 31. To DEVIATE means most nearly to
 A) intend
 B) vary
 C) steer
 D) enlarge
 E) return
 GO ON TO THE NEXT PAGE
 
 115
 (End of page)
 
 
 116
 32. BECAUSE is related to REASON as THEREFORE is related to
 
 A) result
 B) heretofore
 C) instinct
 D) logic
 E) antecedent
 
 117
 33. The saying "Do not make the bite larger than the mouth" means most nearly
 
 
 118
 A) Do not attempt to do work which you do not enjoy.
 
 
 119
 B) Magnifying one's difficulties makes one less able to overcome them.
 
 
 120
 C) Those who want too much are never satisfied.
 
 
 121
 D) An individual should not attempt a task which is beyond his capacity.
 
 
 122
 E) It is unwise to indulge one's appetite.
 
 
 123
 34. (Reading) "Although the types of buildings in ghetto areas vary from the one-story shack to the large tenement building, they are alike in that they are all drab, unsanitary, in disrepair, and often structurally unsound."
 
 
 124
 The quotation best supports the statement that all buildings in ghetto areas are
 
 A) overcrowded
 B) undesirable as living quarters
 C) well-constructed
 D) about to be torn down
 E) seldom inspected
 
 125
 35. Which of the following is the chief reason that posters placed in busses are a successful medium of advertising?
 
 
 126
 A) Their bright colors and pictures attract attention.
 
 
 127
 B) They can be understood by children.
 
 
 128
 C) They are an inexpensive method of advertising.
 
 
 129
 D) All passengers are in a receptive mood when riding in such vehicles.
 
 
 130
 E) They reach a working, and therefore consuming, public.36. To RETRENCH means most nearly to
 
 A) impede
 B) replace
 C) counteract
 D) attack
 E) curtail
 
 131
 37. BRAKE is related to MOTION as DAMPER is related to
 
 A) draft
 B) furnace
 C) accelerator
 D) chimney
 E) humidity
 
 132
 38. The saying "The good seaman is known in bad weather" means most nearly
 
 
 133
 A) Everyone has an opportunity to show his ability.
 
 
 134
 B) Skill is chiefly a matter of practice.
 
 
 135
 C) People seldom complain when things run smoothly.
 
 
 136
 D) One's skill becomes apparent in times of stress.
 
 
 137
 E) No one can do his best under certain conditions.
 
 
 138
 39. (Reading) "Brass is an alloy consisting mainly, if not exclusively, of copper and zinc, but in its older use the term was applied rather to alloys of copper and tin, now known as bronze. It is quite likely that from very early times brass was made accidentally, owing to the mixture of zinc ores with those of copper, but was not recognized as distinct from bronze. One of the earliest examples of Roman brass is a coin made in 20 B.C., containing 17.3 percent zinc."
 
 
 139
 The quotation best supports the statement that
 
 
 140
 A) brass developed somewhat earlier than did bronze
 
 
 141
 B) bronze and brass have one essential ingredient in common
 
 
 142
 C) the earliest known coins were made from brass
 
 
 143
 D) alloys of copper and zinc are now known as bronze
 
 
 144
 E) bronze and brass were first made by the Romans
 
 
 145
 40. The saying "A little knowledge is a dangerous thing" means most nearly
 
 
 146
 A) It is better to be ignorant than to know too much.
 
 
 147
 B) No one knows so much but that he could know more.
 
 
 148
 C) Those who know the least usually do the most talking.
 
 
 149
 D) To know a little about many things is to know nothing well.
 
 
 150
 E) Incomplete information may have unfortunate results.
 
 41. ARTIFICIAL means most nearly
 A) disguised
 B) awkward
 C) genuine
 D) unnatural
 E) useless
 
 151
 42. FRAME is related to PICTURE as MARGIN is related to
 
 A) edge
 B) decoration
 C) page
 D) border
 E) width
 
 152
 43. (Reading) "There are two basic types of silent reading. In one type, called cursory reading, the reader does not try to grasp the meaning of every word but only the essential concept. The other form of silent reading is careful and exact. In the latter type, detailed attention is required in order to assimilate the complete thought. Cursory reading is a valuable tool, but much of the reading required in business must be careful and exact. Too often, people who have become habituated to cursory reading cannot adapt themselves to careful reading."
 
 
 
 09,09
 The quotation best supports the statement that the businessman
 
 
 
 153
 A) cannot afford to read so rapidly as to miss the fine points of the matter read
 
 
 154
 B) is required to relearn his whole method of silent reading
 
 
 155
 C) must do so much reading that he does not take time to read carefullyD) soon becomes highly skilled in reading with speed as well as with accuracy
 
 
 156
 E) fails to realize the need for becoming adept in the two basic types of silent reading
 
 
 157
 44. The saying "Nothing ventured, nothing gained" means most nearly
 
 
 158
 A) Persistent effort brings success.
 
 
 159
 B) Cooperation is vital to achievement.
 
 
 160
 C) A certain amount of risk is required to win anything.
 
 
 161
 D) Success attained without effort is not enduring.
 
 
 162
 E) Success encourages continued effort.
 
 
 163
 45. (Reading) "A sudden brief heavy rain will penetrate the soil less than the same amount of water falling for a longer period, since it takes time for water to expel the soil air and work its way downward among the soil particles. The downward movement is hastened by soil cracks, roots, root paths, and the holes of burrowing animals."
 
 
 
 09,09
 The quotation best supports the statement that penetration of the soil by rain
 
 
 
 164
 A) is rapid as soon as the soil air is expelled
 
 
 165
 B) is affected by the intensity of the rainfall
 
 
 166
 C) depends on the amount rather than the duration of rainfall
 
 
 167
 D) is affected more by the amount of vegetation than by other soil conditions
 
 
 168
 E) is affected only slightly by the presence of soil cracks
 
 46. SKEPTIC means most nearly
 A) guide
 B) enthusiast
 C) mystic
 D) doubter
 E) exile
 
 169
 47. ACCIDENT is related to NEGLIGENCE as SAFETY is related to
 
 A) indifference
 B) appliance
 C) security
 D) danger
 E) carefulness
 
 170
 48. (Reading) "A brush properly selected for the job at hand will not only make the application of paint easier but will also add to the appearance of the finished surface by increasing its smoothness. Brushes with medium or long bristles hold more paint than do brushes with short bristles and therefore reduce the number of times the brush is dipped into the paint, thus saving time. Longer bristles are more flexible and insure a smoother application."
 
 
 
 09,09
 The quotation best supports the statement that in painting a house
 
 
 
 171
 A) choice of the correct type of brush is the most important step
 
 
 172
 B) frequent dipping of the brush into the paint will cause much waste
 
 
 173
 C) use of a thin paint tends to make the job shorter and easier
 
 
 174
 D) best results are likely to be achieved by using a brush with long bristles
 
 
 175
 E) a smooth finish is hard to get with a soft brush
 
 
 176
 49. The saying "Muddy springs will have muddy streams" means most nearly
 
 
 177
 A) A bad ending does not always follow a bad beginning.
 
 
 178
 B) No effort should be made to improve what is worthless.
 
 
 179
 C) Causes are usually less important than results.
 
 
 180
 D) Good cannot come out of evil.
 
 
 181
 E) What cannot be corrected must be accepted.
 
 
 182
 50. (Reading) "When minerals split easily with smooth faces in certain directions, they are said to have the property of cleavage. Some minerals having the property of cleavage, like quartz, when struck a blow, will break into fragments of various shapes; others, like calcite, break into fragments each of the same general shape."
 
 
 
 09,09
 The quotation best supports the statement that when minerals are broken into fragments
 
 
 
 183
 A) the size of the fragments shows whether the mineral possesses cleavage
 
 
 184
 B) the smoothness of the surfaces of the fragments reveals the skill of the worker
 
 
 185
 C) the manner in which the mineral breaks shows if the mineral possesses cleavage
 
 
 186
 D) many of the fragments are more beautiful than the original piece of material
 
 
 187
 E) those minerals possessing cleavage to a high degree break into fragments similar in shape
 
 51. IMPERTINENCE means most nearly
 A) impatience
 B) briskness
 C) conceit
 D) curiosity
 E) incivility
 GO ON TO THE NEXT PAGE
 
 188
 (End of page)
 
 
 189
 52. The saying "Habits are at first cobwebs, at last cables" means most nearly
 
 
 190
 A) Good work habits make any task easier.
 
 
 191
 B) Habits grow stronger with time.
 
 
 192
 C) It is sometimes difficult to acquire good habits.
 
 
 193
 D) Bad habits are the hardest to break.
 
 
 194
 E) Good habits should be acquired early in life.
 
 
 195
 53. (Reading) "Illustrations should really illustrate; too often they are simply photographic inserts to help sell the book. They should develop from and enliven the text and be so much a part of the book that they harmonize with it in spirit and in appearance. Moreover, they should be placed as nearly as possible next to or opposite the paragraph or page illustrated and not scattered at random through the book with a consequent loss of interpretative value."
 
 
 196
 The quotation best supports the statement that the illustrations of a book
 
 
 197
 A) should be grouped rather than scattered through the book
 
 
 198
 B) increase sales appeal only when they truly illustrate
 
 
 199
 C) should be photographs taken from real life
 
 
 200
 D) may be of more value to the reader than is the text
 
 
 201
 E) should serve to add interest to the text
 
 
 202
 54. A tenant who holds a long-term lease on a building will be most likely to gain by the transaction if during the period covered by the lease
 
 A) business rentals vary considerably
 B) real estate becomes cheaper
 C) prices in general are increased
 D) living costs are lowered
 E) the tax rate is decreased
 
 203
 55. (Reading) "Although metals may occur in nature as pure native metal, they are more commonly found in combination with other materials in an ore. An ore is a metal-bearing substance from which a metal, alloy, or metallic compound can be extracted at a profit."
 
 
 204
 The quotation best supports the statement that
 
 
 205
 A) an ore contains other materials in addition to metal
 
 
 206
 B) few metals occur in a pure form in nature
 
 
 207
 C) the extraction of metal from an ore is an expensive process
 
 
 208
 D) some metals are not mined because the cost of extraction is prohibitive
 
 
 209
 E) metals found in ores do not occur in nature as pure native metals
 
 56. DISPARAGEMENT means most nearly
 A) depreciation
 B) distinction
 C) idealization
 D) jealousy
 
 210
 E) reputation57. The saying "Other times, other customs" means most nearly
 
 
 211
 A) Change is more frequent today than in the past.
 
 
 212
 B) Modes of living change with the times.
 
 
 213
 C) Tolerance is a virtue in every society.
 
 
 214
 D) Certain values have remained constant for centuries.
 
 
 215
 E) The ideals of civilization are becoming continually higher.
 
 
 216
 58. (Reading) "Individuals develop personality characteristics on the basis of their innate physiological equipment, the experiences which beset them from birth on, and their relationships with other human beings and with the social institutions that surround them."
 
 
 217
 The quotation best supports the statement that the formation of personality
 
 
 218
 A) is affected as much by physique as by environment
 
 
 219
 B) becomes evident at an earlier age in some persons than in others
 
 
 220
 C) is based on certain factors outside the control of the individual
 
 
 221
 D) determines the types of persons with whom an individual will associate
 
 
 222
 E) is based on hereditary factors rather than social experiences
 
 59. PLACIDITY means most nearly
 A) ignorance
 B) serenity
 C) solitude
 D) timidity
 E) freedom
 
 223
 60. NEWS is related to INFORM as ARGUMENT is related to
 
 A) understand
 B) convince
 C) defy
 D) entertain
 E) deceive
 61. To CAREEN means most nearly to
 A) hurry
 B) thrust
 C) quiver
 D) jostle
 E) lurch
 
 224
 62. RUBBISH is related to DISCARD as TREASURE is related to
 
 A) share
 B) discover
 C) cherish
 D) lose
 E) worry
 
 225
 63. The saying "They wrangle about an egg and let the hens fly away" means most nearly
 
 
 226
 A) They dispute at every opportunity.
 
 
 227
 B) Attention to details is important.
 
 
 228
 C) Arguing is seldom worthwhile.
 
 
 229
 D) They have a poor sense of values.
 
 
 230
 E) A grasping person had few friends.
 
 
 231
 64. (Reading) "Adhering to old traditions, old methods, and old policies at a time when new circumstances demand a new course of action may be praiseworthy from a sentimental point of view, but success is won most frequently by facing the facts and acting in accordance with the logic of the facts."
 
 
 232
 The quotation best supports the statement that success is attained through
 
 
 233
 A) recognizing necessity and adjusting to it
 
 
 234
 B) using methods that have proved successful
 
 C) exercising will power
 
 235
 D) remaining on a job until it is completed
 
 E) considering each new problem separately
 
 236
 65. The saying "The first blow is as much as two" means most nearly
 
 
 237
 A) He who takes the initiative gains a distinct advantage.
 
 
 238
 B) One hard blow is more effective than numerous lighter ones.
 
 
 239
 C) In any struggle the stronger participant makes the first move.
 
 
 240
 D) The wise man takes advantage of every opportunity.
 
 
 241
 E) He who strikes first will win the battle.
 
 66. To EVINCE means most nearly to
 A) claim without good reason
 B) state with certain reservations
 
 242
 C) show in a clear mannerD) follow against one's will
 
 E) deny in an indirect fashion
 
 243
 67. INSERT is related to REMOVE as INTRUDE is related to
 
 A) interrupt
 B) withdraw
 C) conceal
 D) disclaim
 E) enter
 
 244
 68. (Reading) "Fireboats should be of light draft for harbor work, and the larger sizes should be equipped with twin screws for quick turning. Boats of recent construction have steel hulls and steel deck houses; plank-covered decks are preferable to metal, as steel decks are slippery."
 
 
 245
 The quotation best supports the statement that fireboats must be
 
 A) entirely fireproof
 B) built of wood
 C) of recent construction
 D) all of the same size
 E) capable of quick movement
 
 246
 69. In installing fire hydrants, a city should make sure that the outlets are of the same standard thread as those in adjacent cities chiefly because
 
 
 247
 A) in emergencies it is sometimes necessary to borrow fire apparatus from neighboring cities
 
 
 248
 B) one set of apparatus will do for several cities
 
 
 249
 C) the same repairman can be utilized by several cities
 
 
 250
 D) small cities are dependent on the larger cities for fire-extinguishing service
 
 
 251
 E) unused equipment can be returned to dealers
 
 70. TENACIOUS means most nearly
 A) boisterous
 B) obstinate
 C) industrious
 D) inseparable
 E) honorable
 
 252
 71. AMPLIFIER is to HEARING as TELESCOPE is to
 
 A) astronomy
 B) lens
 C) sight
 D) mirror
 E) sound
 GO ON TO THE NEXT PAGE
 
 253
 (End of page)
 
 
 254
 72. The saying "Blind zeal only does harm" means most nearly
 
 
 255
 A) People are not likely to devote their best efforts to work they do not understand.
 
 
 256
 B) Appearances should not affect one's attitude.
 
 
 257
 C) It is difficult to pretend enthusiasm in a hopeless case.
 
 
 258
 D) At times we must let others do the leading.
 
 
 259
 E) Enthusiasm ought to be rightly directed.
 
 73. PROMONTORY means most nearly
 A) marsh
 B) monument
 C) headland
 D) boundary
 E) plateau
 
 260
 74. (Reading) "Soldering is the binding together of two or more metals by means of fusible alloy of tin and lead called solder. The solder used in the operation must melt at a lower temperature than the metals being joined together. However, the nearer the melting points of the solder and the soldered metals, the stronger the completed joint."
 
 
 261
 The quotation best supports the statement that the melting points of metals being soldered should be
 
 
 262
 A) identical with the melting point of the solder
 
 B) identical with each other
 C) high enough to permit a strong joint
 
 263
 D) lower than the melting point of tin or of lead
 
 
 264
 E) higher than the melting point of the solder
 
 75. VIVID means most nearly
 A) rare
 B) intense
 C) imaginary
 D) absurd
 
 265
 E) attractive76. NOTE is related to MESSAGE as PICTURE is related to
 
 A) scene
 B) camera
 C) artist
 D) frame
 E) gallery
 77. An EXIGENCY means most nearly
 A) an undue hurry in acting
 B) a series of misfortunes
 C) an act causing disorder
 D) a case demanding urgent action
 E) a task requiring specific skills
 
 266
 78. The saying "That is well spoken which is well taken" means most nearly
 
 
 267
 A) Sensitive people are quick to imagine insults.
 
 
 268
 B) To accept reproof meekly shows nobleness of spirit.
 
 
 269
 C) The way in which a remark is received demonstrates its appropriateness.
 
 
 270
 D) He who ignores one insult will receive many others.
 
 
 271
 E) He who laughs at his own expense has few enemies.
 
 
 272
 79. (Reading) "When the snow of one winter does not entirely melt during the summer but is added to that of the following winter, there is a gradual accumulation of snow which may result in a glacier. The lower layers are compressed into ice by the weight of the overlying snow and the mass in time begins to spread. The glaciers move downward, following the valleys and ravines, until they reach a point at which the rate of melting equals or exceeds the rate of ice advance."
 
 
 273
 The quotation best supports the statement that glaciers
 
 
 274
 A) cease advancing only upon the arrival of summer
 
 B) move very slowly even on steep slopes
 
 275
 C) move downward and forward until checked by warmth
 
 
 276
 D) form in all areas that are cold and snowy
 
 
 277
 E) cover great distances in their advance each year
 
 
 278
 80. The saying "Anger dies quickly with a great man" means most nearly
 
 A) A good man is slow to anger
 
 279
 B) Nothing ruffles a good disposition.
 
 
 280
 C) One can forgive but not forget.
 
 
 281
 D) Strong passions cannot last.
 
 
 282
 E) To continue to bear malice is petty.
 
 
 283
 PROPERTY OF THE UNITED STATES CIVIL SERVICE COMMISSION
 
 Limited Official Use
 
 284
 This booklet is loaned for official use subject to restrictions regarding the use of Government documents. It should not be reproduced in whole or in part without the express approval of the Civil Service Commission, nor should it be used by anyone for any private purpose whatsoever. Violations may be punishable by fine, or imprisonment, or both.
 
 
 
 [1]
 The litigation originally was a class action challenging allegedly discriminatory practices in promotion of police officers within the Department. That action was decided adversely to the original plaintiffs, Davis v. Washington, 352 F.Supp. 187 (D.D.C.1972), and is not involved in this appeal
 
 
 [2]
 Until 1972, governmental employers were not subject to Title VII of the Civil Rights Act of 1964, Pub.L. No. 88-352, § VII, 78 Stat. 253, 42 U.S.C. § 2000e et seq. (1970), and governmental employees in the states sought relief from allegedly discriminatory practices under the Equal Protection Clause of the Fourteenth Amendment. E. g., Castro v. Beecher, 459 F.2d 725, 733 (1st Cir. 1972); Chance v. Board of Examiners, 458 F.2d 1167, 1169 (2d Cir. 1972); Carter v. Gallagher, 452 F.2d 315, 318 (8th Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). Since the equal protection requirement is imposed on the Federal Government, and its actions in governing the District of Columbia, by the Fifth Amendment Due Process Clause, Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Bolton v. Harris, 130 U.S.App.D.C. 1, 4 n. 3, 395 F.2d 642, 645 n. 3 (1968), these decisions are plainly relevant to the constitutional contentions in the instant case. In addition to their constitutional base, appellants seek a statutory foundation for relief in the Civil Rights Act of 1870. Act of May 31, 1870, ch. 114, § 16, 16 Stat. 144, 42 U.S.C. § 1981 (1970)
 Although appellants' complaint did not allege a violation of Title VII of the Civil Rights Act of 1964, which then was inapplicable to the Federal Government, decisions applying Title VII furnish additional instruction as to the legal standard governing the issues raised in this case. See Part I(B), infra. The many decisions disposing of employment discrimination claims on constitutional grounds have made no distinction between the constitutional standard and the statutory standard under Title VII. E. g., Davis v. Washington, supra note 1, 352 F.Supp. at 191; Bridgeport Guardians, Inc. v. Civil Serv. Comm'n, 482 F.2d 1333 (2d Cir. 1972); Fowler v. Schwarzwalder, 351 F.Supp. 721 (D.Minn.1972). Moreover, while the Title VII protections did not extend to appellants at the time of intervention, Congress has since amended Title VII to reach charges of racial discrimination in federal employment, Equal Employment Opportunity Act of 1972, Pub.L. No. 92-261, § 11, 86 Stat. 111,
 42 U.S.C. § 2000e-16 (Supp. II 1972), and appellants unquestionably are entitled to the benefit of the amendment. See De Rodulfa v. United States, 149 U.S.App.D.C. 154, 164, 461 F.2d 1240, 1250, cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972), and cases cited; Womack v. Lynn, 164 U.S.App.D.C. 198, 504 F.2d 267 (1974).
 
 
 [3]
 Davis v. Washington, 348 F.Supp. 15, 17 (D.D.C.1972)
 
 
 [4]
 The defendants were Walter E. Washington, Mayor-Commissioner of the District of Columbia; Jerry v. Wilson, Chief of Police at the time of intervention (District appellees); and the commissioners of the United States Civil Service Commission (federal appellees)
 
 
 [5]
 The District Court made the determination and direction authorized by Fed.R.Civ.P. 54(b). At the time summary judgment was granted, the claims of discrimination in promotion were still pending. See note 1, supra
 
 
 [6]
 See part II, infra. We have taken Judge Friendly's advice and used this term to avoid the pejorative connotations of synonymous phrases. Vulcan Soc'y v. Civil Serv. Comm'n, 490 F.2d 387, 391 n. 4 (2d Cir. 1973). See Boston Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017, 1019 (1st Cir. 1974); United States v. Chicago, 385 F.Supp. 543, 550 (N.D.Ill.1974)
 
 
 [7]
 See Part III, infra
 
 
 [8]
 Davis v. Washington, supra note 3, 348 F.Supp. at 16
 
 
 [9]
 Id
 
 
 [10]
 Appellants' Appendix at 57 (affidavit of C. Terrence Ireland, P 2). Among the applicants tested outside the District in 1970 and 1971, the failure rate was 47% for blacks and 12% for whites. Id. These data were obtained from the District appellees in discovery proceedings, and include minorities other than blacks in the statistics given for whites. Thus, while "whites and others" would more accurately state the evidence presented to the court, for convenience we will refer to this category as "whites."
 
 
 [11]
 David L. Futransky, Relation of D.C. Police Entrance Test Scores to Recruit School Performance and Job Performance of White and Negro Policemen, mimeograph, November, 1967 (hereinafter cited as Futransky Study)
 
 
 [12]
 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)
 
 
 [13]
 See note 2, supra, and accompanying text
 
 
 [14]
 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164
 
 
 [15]
 Id. See McDonnell Corp. v. Green, 411 U.S. 792, 802 & n. 14, 93 S.Ct. 1817, 1824 & n. 14, 1824, 36 L.Ed.2d 668, 678 & n. 14 (1973); Bridgeport Guardians, Inc. v. Civil Serv. Comm'n, supra note 2, 482 F.2d at 1337; Officers for Justice v. Civil Serv. Comm'n, 371 F.Supp. 1328, 1336 (N.D.Cal.1973); Smith v. East Cleveland, 363 F.Supp. 1131, 1147 (N.D.Ohio 1973)
 
 
 [16]
 See Part II, infra
 
 
 [17]
 Davis v. Washington, supra note 3, 348 F.Supp. at 16
 
 
 [18]
 See Part II, infra
 
 
 [19]
 Davis v. Washington, supra note 3, 348 F.Supp. at 17
 
 
 [20]
 See Part III, infra
 
 
 [21]
 See text supra at note 10
 
 
 [22]
 Castro v. Beecher, supra note 2, 459 F.2d at 729 (passing rate 25% for blacks and 65% for whites); Bridgeport Guardians, Inc. v. Civil Serv. Comm'n, supra note 2, 482 F.2d at 1335 (passing rate for whites 31/2 times the black rate); Chance v. Board of Examiners, supra note 2, 458 F.2d at 1171 (passing rate for whites 11/2 times greater than passing rate for blacks); United States v. Chicago, supra note 6, 385 F.Supp. at 550 (failure rate for blacks twice the rate for whites); Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1089-90 (E.D.Pa.1972), aff'd in part and vacated in part, 473 F.2d 1029 (3d Cir. 1973) (1.82 times as many whites pass as blacks)
 
 
 [23]
 Compare the cases cited supra note 22
 
 
 [24]
 See Davis v. Washington, supra note 3, 348 F.Supp. at 16. There is some disagreement concerning what figures might be relevant in this regard. Appellees contend that the Department recruits primarily within a 50-mile radius of the District of Columbia; they assert that the percentage of blacks in the Department compares favorably with the percentage of blacks in the 20-29 age group in the area of recruitment. Appellants argue, however, that the pertinent population figures are those for the District alone; and since the proportion of blacks in the District is much higher than in surrounding areas, they seek support in the comparison they make. We decline to resolve the dispute, because we deem neither comparison material to this appeal. See Boston Chapter, NAACP, Inc. v. Beecher, supra note 6, 504 F.2d at 1020 n.4
 
 
 [25]
 Boston Chapter, NAACP, Inc. v. Beecher, supra note 6, 504 F.2d at 1020; Morrow v. Crisler, 479 F.2d 960, 961-62 (5th Cir.), aff'd on rehearing en banc, 491 F.2d 1053 (1974); Carter v. Gallagher, supra note 2, 452 F.2d at 323; Penn v. Stumpf, 308 F.Supp. 1238, 1243 (N.D.Cal.1970)
 
 
 [26]
 Bridgeport Guardians, Inc. v. Civil Serv. Comm'n, supra note 2, 482 F.2d at 1335; Chance v. Board of Examiners, supra note 2, 458 F.2d at 1173; Officers for Justice v. Civil Serv. Comm'n, supra note 15, 371 F.Supp. at 1332-33 (N.D.Cal.1973); Smith v. East Cleveland, supra note 15, 363 F.Supp. at 1146; Castro v. Beecher, 334 F.Supp. 930, 935 (D.Mass.1971), aff'd in part and remanded in part, 459 F.2d 725 (1st Cir. 1972)
 
 
 [27]
 See cases cited supra notes 25-26
 
 
 [28]
 Griggs v. Duke Power Co., supra note 12, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165 (emphasis in original)
 
 
 [29]
 Boston Chapter, NAACP, Inc. v. Beecher, supra note 6, 504 F.2d at 1021; Bridgeport Guardians, Inc. v. Civil Serv. Comm'n, supra note 2, 482 F.2d at 1336; Vulcan Soc'y v. Civil Serv. Comm'n, 360 F.Supp. 1265, 1272 (S.D.N.Y.), aff'd in part and remanded in part, 490 F.2d 387 (2d Cir. 1973); Penn v. Stumpf, supra note 25, 308 F.Supp. at 1244
 
 
 [30]
 Hicks v. Crown Zellerbach Corp., 319 F.Supp. 314, 320 (E.D.La.1970)
 
 
 [31]
 United States v. Jacksonville Terminal Co., 451 F.2d 418, 443 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Smith v. East Cleveland, supra note 15, 363 F.Supp. at 1146; Western Addition Community Organization v. Alioto, 330 F.Supp. 536, 540 (N.D.Cal.1971). See also Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1372-73 (5th Cir. 1974)
 
 
 [32]
 The District Court noted that factors other than Test 21 may also have limited black recruitment. The court stated that many blacks pass Test 21 but fail to report for duty, "thus showing how small a part the Test per se results in failure to recruit more blacks." 348 F.Supp. at 16-17. The record does show that only 48% of blacks who passed Test 21 between January 1, 1970 and September 4, 1970 reported for duty. Appellants' Appendix at 72-73 (affidavit of James M. Murray). The same evidence also reveals, however, that only 49% of the whites who passed Test 21 in the same period reported for duty. To attach any significance to the black failure is to ignore the fact that the same phenomenon occurs among whites. Furthermore, during the same time period, blacks comprised 72% of the applicants taking Test 21 in the District of Columbia, but only 56% of those who passed and 55% of all new officers reporting for duty. If the examination had no disparate effect, one would expect approximately 72%, rather than 55 or 56%, of the successful applicants to be black
 
 
 [33]
 Arrington v. Massachusetts Bay Transp. Auth., 306 F.Supp. 1355, 1358 (D.Mass.1969)
 
 
 [34]
 Kirkland v. State Dep't of Correctional Services, 374 F.Supp. 1361, 1364 (S.D.N.Y.1974)
 
 
 [35]
 In every one of the more than twenty reported decisions involving this issue cited in this opinion, the final judicial result has encompassed a conclusion of racially disproportionate impact
 
 
 [36]
 Griggs v. Duke Power Co., supra note 12, 401 U.S. at 430, 91 S.Ct. at 853, 28 L.Ed.2d at 163-164. See also Gaston County v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969); Hobson v. Hansen, 269 F.Supp. 401, 419-21 (D.D.C.1967), aff'd sub nom., Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (en banc 1969)
 
 
 [37]
 See text supra at note 15. The federal appellees intimated to the District Court that the issue of job relatedness must be reached in this case even in the absence of any showing of racially disproportionate impact. In their memorandum of points and authorities in support of their motion for summary judgment, they acknowledged that 5 U.S.C. § 3304(a) (1970) requires that examinations given pursuant to Civil Service Commission authority be job related. See D.C.Code § 4-103; Note, Legal Implications of the Use of Standardized Ability Tests in Employment and Education, 68 Colum.L.Rev. 691, 729 (1968). Appellants have not claimed that they have been deprived of any rights guaranteed by § 3304(a). Because appointments to the Metropolitan Police Department are generally subject to civil service rules, there is a serious question as to whether the validity of Test 21 should be determined by the Equal Employment Opportunity Commission regulations or by the Civil Service Commission regulations,
 which may be inconsistent with the EEOC guidelines. Compare 29 C.F.R. §§ 1607.1 et seq. (1973) (EEOC), with 5 C.F.R. §§ 300.101 et seq. (1974) (CSC). The EEOC guidelines have been followed in the decisions dealing with validation of employment tests, and have been recognized as controlling at least one circuit. United States v. Georgia Power Co., 474 F.2d 906, 913 (5th Cir. 1973). See also Griggs v. Duke Power Co., supra note 12, 401 U.S. at 433-34, 91 S.Ct. at 854-855, 28 L.Ed.2d at 165-166. Castro v. Beecher, supra note 2, 459 F.2d at 725; Vulcan Soc'y v. Civil Serv. Comm'n, supra note 6, 490 F.2d at 394 n.8; Carter v. Gallagher, supra note 2, 452 F.2d at 320; Officers for Justice v. Civil Serv. Comm'n, supra note 15, 371 F.Supp. at 1337; Davis v. Washington, supra note 1, 352 F.Supp. at 191. The EEOC guidelines have also been substantially adopted by the Office of Federal Contract Compliance. 41 C.F.R. §§ 60-3.1 et seq. (1974).
 In any event, the issue is largely academic in view of our holding in Douglas v. Hampton, 512 F.2d 976, decided today.
 
 
 [38]
 For whites, 92% of the recruits with raw Test 21 scores over 60 averaged over 85 in Recruit School, 80% of white recruits who scored from 52 to 60 had that average, and 63% of white recruits who scored from 40 to 51 attained an 85 average. For blacks, 78% of the scorers over 60 achieved an 85 average, 70% of black recruits who scored from 52 to 60 had such an average, and 54% of black recruits who scored from 40 to 51 average over 85 in Recruit School. These figures yield a correlation of .46 for whites and .39 for blacks. Futransky Study, supra note 11, at 2. For the purposes of this appeal, we accept these figures as statistically significant. See Boston Chapter, NAACP, Inc. v. Beecher, supra note 6, 504 F.2d at 1024 n.13
 
 
 [39]
 Compare Harper v. Mayor & City Council, 359 F.Supp. 1187, 1202-03 (D.Md.), modified and aff'd, 486 F.2d 1134 (4th Cir. 1973), with Pennsylvania v. O'Neill, supra note 22, 348 F.Supp. at 1091. "(I)n many cases the apparent value of tests in predicting training success is spurious in that training success is measured by scores on other paper and pencil tests. In order for tests to be meaningfully evaluated, training success must be measured by some sort of performance evaluation which demonstrates whether high scorers on the original test are actually able to learn more quickly or more effectively to perform the job or jobs in question, rather then simply to score well on a subsequent test." Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1649 (1969)
 
 
 [40]
 The Recruit School examinations are not in the record, and there is no other basis in the record for confirming or disputing the hypothesis stated in text. Although the textual discussion questions whether appellees have met their heavy burden in this regard, we think it unwise to dispose of the case on that basis. It is uncertain whether any evidence could be generated to test the hypothesis, and to remand for consideration of the issue would not serve the interests of judicial economy in light of the overall result we reach in this case
 
 
 [41]
 Futransky Study, supra note 11
 
 
 [42]
 Id. at 1
 
 
 [43]
 Id. at 2. See note 38, supra
 
 
 [44]
 Indeed, the Futransky Study indicates that the contrary may be true. The study found no significant correlation between final Recruit School averages and job performance as measured by positive and negative incidents-commendation, appointment to a position of responsibility, below-average rating by supervisor, resignation with prejudice and disciplinary action. Id. at 5
 
 
 [45]
 Id. at 8. The difficulties in drawing any inference about job performance of failures solely from the performance of passers of an examination have been judicially noted. Boston Chapter, NAACP, Inc. v. Beecher, supra note 6, 504 F.2d at 1025; United States v. Georgia Power Co., supra note 37, 474 F.2d at 916. If appellees' study had demonstrated a positive correlation between low scores on Test 21 and failures in Recruit School, the data might have supported an inference that those who score below 40 on Test 21 are more likely to fail in Recruit School. No conclusion could be drawn in this regard, however, because there were no failures in Recruit School
 
 
 [46]
 Davis v. Washington, supra note 3, 348 F.Supp. at 16; Futransky Study, supra note 11, at 8
 
 
 [47]
 Cf. Harper v. Mayor & City Council, supra note 39, 359 F.Supp. at 123 n.38
 
 
 [48]
 Cf. Pennsylvania v. O'Neill, supra note 22, 348 F.Supp. at 1091
 
 
 [49]
 See id. at 1090 n.6
 
 
 [50]
 They first rely on a statement in Spurlock v. United Airlines, Inc., 330 F.Supp. 228 (D.Col.1971), aff'd 475 F.2d 216 (10th Cir. 1972), in which the court held the requirement of a college degree job related to aircraft piloting. The court found "a direct and substantial correlation between successful completion of the training program and a college degree." 330 F.Supp. at 235. Unlike the controlling force placed on Test 21 by the Metropolitan Police Department, however, the degree requirement was waived if an applicant had sufficient flight time, id. at 235; cf. Griggs v. Duke Power Co., supra note 12, 401 U.S. at 436, 91 S.Ct. 849; and the minimum flight time requirement was found to predict actual job performance. Id. at 235
 Other cases relied upon by appellees are also distinguishable. In Castro v. Beecher, supra, note 26, there was no effort to relate test scores to training performance, 334 F.Supp. at 942; the court merely noted that the police department there involved had not even tried to make such a showing. Id. at 942, and we see nothing intimating that the court would have held that a convincing showing of such a relationship validated the examination. Finally, in Buckner v. Goodyear Tire & Rubber Co., 339 F.Supp. 1108 (N.D.Ala.1972), aff'd 476 F.2d 1287 (5th Cir. 1973), the court sustained a test that predicted performance in a training program, but held that the training program was the job: "there is a demonstrable relationship between the tests used and the job (i. e., participation in the four year apprenticeship program) for which the tests are used." Id. at 1114. Apprentices in Buckner had their education subsidized by the employer, were on the payroll while being trained,
 and went through an 8000-hour four-year program at a cost to the employer of $36,000 per apprentice. The facts of the case at bar would not justify a similar finding; the cost of training an individual police recruit is hardly close to $36,000 and the training program is relatively short.
 
 
 [51]
 Officers for Justice v. Civil Serv. Comm'n, supra note 15, 371 F.Supp. at 1337 (police officers); Smith v. East Cleveland, supra note 15, 363 F.Supp. at 1148-49 (police officers); Harper v. Mayor & City Council, supra note 39, 359 F.Supp. at 1202-03 (firemen); Pennsylvania v. O'Neill, supra note 22, 348 F.Supp. at 1090-91 (police officers)
 
 
 [52]
 Pennsylvania v. O'Neill, supra note 22
 
 
 [53]
 Id. at 1090
 
 
 [54]
 Id. See note 44, supra
 
 
 [55]
 Id. at 1091. See note 40, supra
 
 
 [56]
 Id. See text supra at note 45
 
 
 [57]
 Id. See text supra at note 46
 
 
 [58]
 See cases cited note 52, supra
 
 
 [59]
 Section 703(h) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(h) (1970), is the authority asserted by appellees for this proposition. They refer to a statement by Senator Tower, the author of § 703(h), that the provision would allow employers to "give general ability and intelligence tests to determine the trainability of prospective employees." 110 Cong.Rec. 13,492 (1964). A decision as to whether § 703(h) permits validation by correlation to trainability, rather than job performance, is not a simple or insignificant endeavor. One professional commentator notes that "from validation studies of tests with training criteria, one must generalize with great caution about the validity of those tests for (job) proficiency.... (T) he abilities and traits which are important for success in training are not very similar to those which determine success in the performance of the actual job." E. Ghiselli, The Validity of Occupational Aptitude Tests 119 (1966). We decline to express any opinion on the merits of this issue on these facts, for appellees have not proved a case that presents the question
 We do note, however, that the legislative history of the 1972 amendments to Title VII of the Civil Rights Act of 1964, see note 2, supra, reveals congressional concern over use of general ability tests in hiring and promotion by the Civil Service Commission. H.R.Rep.No.238, 92d Cong., 1st Sess. 24 (1971), U.S.Code Cong. & Admin.News, 1972, p. 2137.
 
 
 [60]
 See Davis v. Washington, supra note 3, 348 F.Supp. at 17. But see Pennsylvania v. O'Neill, supra note 22, 348 F.Supp. at 1103
 
 
 [61]
 Davis v. Washington, supra note 3, 348 F.Supp. at 17
 
 
 [62]
 Id. at 18
 
 
 [63]
 See Douglas v. Hampton, supra note 37, 168 U.S.App.D.C. at ---, 512 F.2d at 984. The dissent correctly notes that Griggs involved a distinguishable job situation, but many subsequent decisions have followed the same analysis when dealing with police officers and fire personnel. See cases cited notes 25, 26 & 29, supra, and note 65, infra
 
 
 [64]
 There has been no attempt to establish that proof of the empirical validity of Test 21 is not feasible. See Douglas v. Hampton, supra note 37, 168 U.S.App.D.C. at ---, 512 F.2d at 986. Perhaps more importantly, there is no evidence that directly relates the constructs of Test 21 to job performance. See id. at ---, 512 F.2d at 986. In the absence of such evidence, general concepts of common sense are inadequate aids to meaningful analysis of the crucial issues in this case
 
 
 [65]
 E. g., United States v. Chicago, supra note 6, 385 F.Supp. at 561; Officers for Justice v. Civil Serv. Comm'n, supra note 15, 371 F.Supp. at 1342; Smith v. East Cleveland, supra note 15, 363 F.Supp. at 1152; Harper v. Mayor & City Council, supra note 39, 359 F.Supp. at 1218; Pennsylvania v. O'Neill, supra note 22, 348 F.Supp. at 1104
 
 
 [66]
 Cf. Steffel v. Thompson, 415 U.S. 452, 461, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); Samuels v. Mackell, 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)
 
 
 [67]
 The motion was for a partial summary judgment because it did not involve the promotion issues. See note 1, supra
 
 
 [68]
 We note that the District Court granted the federal appellees' motion and also dismissed the action as to them, while it did not dismiss as to District appellees. It is unclear why this difference exists, and we intimate no view as to the propriety of the dismissal on grounds not discussed in this opinion