George ARTHUR et al., Plaintiffs,

v.

Ewald P. NYQUIST et al., Defendants.

No. Civ–1972–325.

United States District Court,
W. D. New York.

March 1, 1977.

---

Richard F. Griffin, Buffalo, N. Y., and Herman Schwartz, Amherst, N. Y., for plaintiffs.

Louis J. Lefkowitz, Atty. Gen., New York City (Ruth Kessler Toch, Sol. Gen., and Jean M. Coon, Asst. Sol. Gen., Albany, N. Y., of counsel), and (Eugene A. Panfil, Asst. Atty. Gen., Buffalo, N. Y., of counsel), for the Commissioner of Education and the Board of Regents of the State of New York, defendants.

Linden & Deutsch, New York City (David Blasband, New York City, of counsel), for Individual Regents Barell, Indelicato, Genrich, Griffith, Klein, Jovanovich, Kendall & Yavner, defendants.

Leslie G. Foschio, Corp. Counsel, Buffalo (Anthony Gregory, Asst. Corp. Counsel, and Aubrey McCutcheon, Special Counsel, Buffalo, N. Y., of counsel), for Mayor Stanley M. Makowski, Superintendent of Schools Eugene T. Reville, The Board of Education, and the Common Council of the City of Buffalo, defendants.

CURTIN, Chief Judge.

In December 1976, after the Supreme court vacated and remanded the Austin school case, *Austin Independent School District v. United States*, —— U.S. ——, [97 S.Ct. 517, 50 L.Ed.2d 603] (1976), this court requested each of the parties to this school case to brief the *Austin* case and *Washington v. Davis*, 426 U.S. 229, [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976), the case that prompted the Supreme Court's action in *Austin*. Following this court's request, the City defendants by motion asked this court to vacate its April 30, 1976 liability decision, *Arthur v. Nyquist*, 415 F.Supp. 904 (W.D.N.Y.1976), or, in the alternative, to reconsider that decision in light of *Washington v. Davis* and *Austin*. The court has agreed to reconsider its decision.

The City defendants contend that *Washington v. Davis*, the *Austin* case, and the subsequently decided case of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, —— U.S. ——, [97 S.Ct. 555, 50 L.Ed.2d 450] (1977), all of which are post-April 30, 1976 cases, have changed the law this court relied on in its liability decision. The State defendants urge the same argument in their briefs. To determine the impact of these cases requires a close look at each.

I. WASHINGTON v. DAVIS

In *Washington v. Davis*, 426 U.S. 229, [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976), the plaintiffs alleged that a test administered by the District of Columbia's Police Department to prospective police officers was a violation of their fifth amendment due process rights. The plaintiffs, two black men whose applications had been rejected, did not claim that the department intentionally discriminated against them through the use of the test, but merely charged that the test had "a highly discriminatory impact in screening out black applicants." 348 F.Supp. 15, 16 (D.D.C.1972). On appeal, the circuit court reversed the district court and held that the disproportionate racial impact alone was sufficient to sustain plaintiff's claim of a constitutional wrong. [168 U.S. App.D.C. 42] 512 F.2d 956, 960 (1975).

The Supreme Court's decision in *Washington*, overruling the circuit court, stated explicitly:

> [O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact. 426 U.S., at 239, [96 S.Ct., at 2047] (emphasis in original).

During the course of its opinion, the Court noted that school cases have adhered to the principle that "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." 426 U.S., at 240, [96 S.Ct., at 2048.] The Court cited with approval its 1973 decision in the Denver school case, *Keyes v. School District No. 1*, 413 U.S. 189, 205, [93 S.Ct. 2686, 37 L.Ed.2d 548] (1973), in which the Court had stated that one of the essential elements of *de jure* segregation is "a current condition of segregation resulting from intentional state action."

## II. AUSTIN

When the Supreme Court vacated the circuit court opinion in the *Austin* case, it remanded the case to the circuit court "for reconsideration in light of *Washington v. Davis*." —— U.S. ——, [97 S.Ct. 517, 50 L.Ed.2d 603] (1976). Some light was shed on the Court's thinking by the separate opinion of Justice Powell, concurred in by Chief Justice Burger and Justice Rehnquist, which stated:

> As suggested by this Court's remand premised upon *Washington v. Davis*, supra, the Court of Appeals may have erred by a readiness to impute to school officials a segregative intent far more pervasive than the evidence justified.[1]
>
> [1] Although in an earlier stage in this case other findings were made which evidenced segregative intent, see, e. g., *United States v. Texas Education Agency*, 467 F.2d 848, 865–869 (CA 5 1972) (actions by school authorities contributing to segregation of Mexican-American students), the opinion below apparently gave controlling effect to the use of neighborhood schools. . . .

The *Austin* case has a long history. Filed in 1970, the suit alleged that the Austin Independent School District [AISD] discriminated against both black and Mexican-American students. With respect to the latter, however, the district court found that the Government did not prove intentional discrimination. On appeal, the circuit court, in an en banc decision, 467 F.2d 848 (5th Cir. 1972) [*Austin* I], reversed this finding as clearly erroneous. Among other things, the circuit court stated:

> The district court may have applied an erroneous legal standard. . . .
>
> It is not necessary to prove discriminatory motive, purpose, or intent as a prerequisite to establishing an equal protection violation when discriminatory effect is present. 467 F.2d, at 864–865, n.25.

The case came back on appeal to the Fifth Circuit after the district court had adopted and put into effect the remedy proposal of the AISD. In the intervening years, the Supreme Court had decided the *Keyes* case, in which it specifically noted the intent requirement. The circuit court admitted that the "cause and effect"[1] test previously applied in *Austin* I, which obviated any need for finding discriminatory intent, was supervened by *Keyes*. The court proceeded to find the defendants had intentionally discriminated against the plaintiffs. 532 F.2d 380, 390–392 (5th Cir. 1976) [*Austin* II]. However, it apparently is unclear to the Supreme Court, as evidenced by Justice Powell's words, *supra*, whether the Fifth Circuit made a proper finding of intent. During the course of his opinion, Judge Wisdom noted that Austin is a residentially segregated city, and that the "natural, foreseeable, and inevitable result of the AISD's student assignment policy," 532 F.2d, at 390, which is to assign a student to the school nearest his or her home, is a segregated school system in Austin. The inference of discriminatory intent, said the court, was inescapable. The reason for utilizing the "reasonable and foreseeable consequences" test is that "it is difficult—

[1] The "cause and effect" language appears to have originated in *Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142 (5th Cir. 1972), a school desegregation case in which the court, after announcing: "we discard the anodyne dichotomy of classical de facto and de jure segregation," set up the following test:

> We need only find a real and significant relationship, in terms of cause and effect, between state action and the denial of educational opportunity occasioned by the racial and ethnic separation of public school students. 467 F.2d, at 148.

and often futile—to obtain direct evidence of [an] official's intentions." 532 F.2d, at 388.

Justice Stevens, in a concurring opinion in *Washington v. Davis, supra,* has made the same observation:

> Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. *For normally the actor is presumed to have intended the natural consequences of his deeds.* This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation.
>
> . . .
>
> My point in making this observation is to suggest that the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of [*Washington v. Davis*] might assume. 426 U.S., at 253–254, [96 S.Ct., at 2054.]

## III.  ARLINGTON

In *Arlington,* a non-profit developer had arranged to buy a tract of land in a suburb of Chicago and build low and moderate income housing. The projected series of town houses, amounting to some 190 units, would occupy a fifteen-acre tract that had been zoned for single-family houses. The developer requested a zoning change to allow his multiple-family project to proceed and he was turned down.

Arlington, in the 1970 census, was recorded as having 64,000 residents of whom twenty-seven were black. The town house development was expected to be integrated, and the developer and several prospective black tenants sued various Arlington officials claiming that the refusal to rezone the land was a violation of their fourteenth amendment rights. After a trial, the district court ruled that the plaintiffs had not proved that defendants' actions were motivated by racial discrimination. Instead, the court found that the village officials acted "to protect property values and the integri-

ty of the Village's zoning plan." 373 F.Supp. 208, 211 (N.D.Ill.1974). The court noted that this particular parcel had been zoned for single-family use ever since 1959 when the zoning map was first drawn up.

On appeal, however, the circuit court, although it agreed that racial discrimination had not motivated the defendants, reversed because the refusal to rezone the tract had a racially disproportionate effect. 517 F.2d 409 (7th Cir. 1975). The Supreme Court, citing *Washington v. Davis,* stated that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Arlington, supra,* —— U.S. at ——, [97 S.Ct. at 563.]

As Justice Stevens did in *Washington v. Davis,* the *Arlington* Court went on to discuss at some length the inherent difficulty of imputing intent when the actions of a group of people are concerned.

> Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. . . . But racial discrimination is not just another competing consideration. . . .
>
> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action . . . may provide an important starting point. *Arlington, supra,* —— U.S. at ——, [97 S.Ct. at 563.]

Since the district court had found, and the Court of Appeals had agreed, that no racially discriminatory intent was proved, the Supreme Court reversed the Court of Appeals.

## IV.  THE INTENT REQUIREMENT

Certainly the impact of *Washington v. Davis, Austin,* and *Arlington* is that there may be no finding of racial discrimination in violation of the Constitution without a finding of discriminatory intent. This much is uncontested by the parties. Furthermore, if this were the full import of

these cases, no reconsideration of this court's decision would be warranted since the court made findings of the requisite discriminatory intent as to the Board of Education, the Common Council, the Superintendent of Schools, the Board of Regents and the Commissioner of Education. The critical question following these cases, however, and the point on which the defendants claim this court's findings are faulty, is the standard for intent.

Implicit in these recent cases, the defendants' argument goes, is a complete rejection of the "probable and foreseeable consequences" test as a measure of intent. This test, which has been utilized to varying degrees by a number of courts,[2] including the circuit court in *Austin* II, *supra*, was adopted in this circuit in the case of *Hart v. Community School Board*, 512 F.2d 37 (2d Cir. 1975). Since this court cited and relied on *Hart*, and since this court made use of this standard in its decision, the defendants argue that the findings of intent were improper.

## V. THE HART TEST

In *Hart*, a school desegregation suit involving only one school, Mark Twain Junior High School in Brooklyn, New York, Judge Weinstein in his district court decision, 383 F.Supp. 699 (E.D.N.Y.1974), made the somewhat unusual finding that the defendants, although they had, among other things, changed feeder patterns, amended attendance zones and constructed a new junior high school with the "natural and foreseeable impact of . . . helping create severe racial imbalance," nevertheless found that the defendants did not desire Mark Twain to become segregated. 383 F.Supp., at 716, 721. Treating the case as an example of *de facto* segregation, Judge Weinstein went on to find a constitutional violation because school officials took steps they knew would enhance the segregation and refused to take steps to alleviate it. 383 F.Supp., at 755.

On appeal, the Community School Board urged that the district court had applied the wrong standard and that it could not charge the Board with segregating the school and at the same time declare it innocent of any racially discriminatory intent. The appeals court acknowledged that the district court's findings were "somewhat inconsistent," 512 F.2d, at 48, and disagreed that the evidence showed *de facto* segregation. The intent required for a finding of *de jure* segregation, the court ruled, "may be evidenced by the performance of acts, the foreseeable consequence of which is segregation." 512 F.2d, at 51.

The circuit court realized that this standard had not been given official, explicit approval by the Supreme Court, but, citing cases that indicated approval of an objective standard of intent,[3] it said:

> Unless the Supreme Court speaks to the contrary, we believe that a finding of *de jure* segregation may be based on actions taken, coupled with omissions made, by governmental authorities which have the natural and foreseeable consequence of causing educational segregation. 512 F.2d, at 50.

■ To the extent that the *Hart* standard suggested that mere cause and effect, mere analysis by way of a "reasonable and foreseeable consequences" test which amounts to a finding that disproportionate impact is sufficient to impose liability for school segregation under the fourteenth amendment, it is refuted by *Washington v. Davis* and *Arlington*.[4] This apparently is

---

**2.** For a list of cases that have considered the use of this standard, *see Austin* II, *supra*, 532 F.2d, at 389, n.6.

**3.** The *Hart* court, as well as the *Austin* I and II and *Cisneros* courts relied in part on *Palmer v. Thompson*, 403 U.S. 217, [91 S.Ct. 1940, 29 L.Ed.2d 438] (1971), and *Wright v. Council of City of Emporia*, 407 U.S. 451, [92 S.Ct. 2196, 33 L.Ed.2d 51] (1972). *See* 512 F.2d, at 47–51;

467 F.2d at 150–151, 864–865; 532 F.2d at 388. The Supreme Court admitted in *Washington v. Davis, supra,* that the *Palmer* and *Wright* cases were susceptible to this interpretation. 426 U.S., at 242–244, [96 S.Ct. 2040.]

**4.** The defendants point particularly to the following passage in the court's decision:

> In deciding the question of intent, the court is not required to find guilt or innocence,

what the Supreme Court thought might have happened in *Austin* II. But this court does not read either *Washington v. Davis* or *Arlington* to prohibit the use of the foreseeable consequences test to analyze circumstantial evidence in evaluating the intent of defendants in school cases. At a minimum, "[t]he impact of the official action—whether it 'bears more heavily on one race than another,' *Washington v. Davis*, 426 U.S., at 242 [96 S.Ct. 2040]—may provide an important starting point." *Arlington, supra,* —— U.S. at ——, [97 S.Ct. at 564.]

█ The Supreme Court has acknowledged repeatedly the necessity, and the difficulty, of inquiring into the motive behind objective acts. *See Arlington, supra,* —— U.S. at —— – ——, [97 S.Ct. 555]; *Washington v. Davis, supra,* 426 U.S., at 253–254, [96 S.Ct. 2040] (J. Stevens, concurring). *Washington v. Davis, Austin* and *Arlington* merely emphasize that the motive behind actions and inactions, and not the resultant impact alone, is determinative when a constitutional violation is alleged.

## VI. RECONSIDERATION

█ Having completed this long analysis of what some considered a "semantic" argument before *Washington v. Davis* and *Arlington, see Hart, supra,* 512 F.2d, at 51, the court must now reconsider its opinion of April 30, 1976. The question on reconsideration is simply this—did this court find that the defendants intentionally acted and refused to act so as to segregate and maintain the segregated condition of the Buffalo Public School system, or did it find a constitutional violation on the basis of disproportionate racial impact alone, without a finding of racial discriminatory intent.

prejudice or evenhandedness, or even "badness" or "goodness" on the part of the defendants. To prove their case, plaintiffs are not required to show that racist motives prompted the defendants, nor even that defendants wanted the schools to be segregated, although proof of either of these would be sufficient to show the required intent. It is enough, as the Second Circuit explained in *Hart v. Community School Board*, 383 F.Supp. 699 (E.D.N.Y.1974), aff'd 512 F.2d 37

The April 30, 1976 liability decision is detailed and extensive. The court cited and relied on the leading Supreme Court case of *Keyes v. School District No. 1, supra,* which requires that plaintiffs prove "purposeful or intentional segregative acts by the defendants." *Arthur v. Nyquist, supra,* 415 F.Supp., at 912. Following the command of *Keyes,* this court labored to conduct what the Supreme Court later called "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington, supra,* —— U.S., at ——, [97 S.Ct. at 564.] At the City defendants' request, the court has backtracked and reviewed its findings carefully. It is not necessary now to repeat at length all the evidence of purposeful intent contained in the April 30, 1976 decision, but a brief review should serve to put the findings in perspective. It should be emphasized that by citing here a few examples of the evidence produced at trial, the court is not indicating that the rest of the proof, explained in greater detail in the original decision, is no longer persuasive.

EAST HIGH—The plaintiffs proved at trial that the Board ignored its own curriculum policy, offering a special foreign language at a high school where sufficient student support existed, when it allowed large numbers of foreign language transfers out of East. The great proportion of transferring students were white. The Board was aware of the detrimental racial effect this was having on East, and no reason existed for ignoring or circumventing its own curriculum policy. This evidence, in addition to other proof on redistricting of East's district, was sufficient to find that the Board intended that white

(2d Cir. 1975), to show that the probable and foreseeable result of the defendants' acts was segregation. 415 F.Supp., at 912–913. To the extent that this misstates the law on intent after *Washington v. Davis* and *Arlington, supra,* the court stands corrected. However, the court believes that although it may have overstated the law in this particular paragraph, the findings on intent, which the court reviews, *infra,* are based on a more narrow standard.

students be allowed to avoid East and that East become a black school.

WOODLAWN JUNIOR HIGH—This court found that the plaintiffs failed to prove racial intent in the siting of Woodlawn Junior High School. But when it came to the districting of that school, the question of intent was inescapable. There was overwhelming evidence, including the testimony of Board members, that the Board intended that Woodlawn be a black junior high.

■ TRANSFERS AND OPTIONAL AREAS—In *Arlington,* the Supreme Court noted that procedural and substantive departures from the norm are sometimes probative of racial intent. *Arlington, supra,* —— U.S., at ——, [97 S.Ct. 555.] The plaintiffs' proof that some white students were allowed to transfer to avoid black schools for reasons that were inadequate under official Board policy, that others were allowed by individual principals to transfer instead of following normal procedure and applying to the Office of Pupil Personnel Services, and that some white students were able to avoid black schools because some predominantly white areas were made optional areas, are examples of such procedural and substantive irregularities that can support a finding of invidious purpose. The court examined the Board's actions with respect to several elementary schools in particular, and found that the evidence on transfers and optional areas was sufficient to support a finding of discriminatory intent.

VOCATIONAL — TECHNICAL SCHOOLS—The Board admitted that its admissions policies at particular schools were discriminatory, so the question of intent did not arise.

STAFF—The assignment of minority staff and minority administrators to predominantly or all minority schools was admittedly done intentionally.

■ The finding on staff recruiting stands on different grounds. The plaintiffs' proof on this question consisted essentially of statistics showing that minority staff had not increased perceptibly, in percentage terms, in over ten years time. Standing alone, it is arguable whether this evidence meets the "stark pattern" test of *Gomillion v. Lightfoot,* 364 U.S. 339, [81 S.Ct. 125, 5 L.Ed.2d 110] (1960). See *Arlington, supra,* —— U.S., at ——, [97 S.Ct. 555.] But this is not simply a hiring discrimination suit, and the individual parts of a full spectrum school discrimination suit cannot be isolated from each other. See *Keyes, supra,* 413 U.S., at 207, [93 S.Ct. 2686.] The overall evidence of racial discrimination in other areas of the school system, and in particular the admitted assignment of black staff and administrators to predominantly or all minority schools, is sufficient to support a finding that the limitation on minority hiring was purposeful.

COMMON COUNCIL—The Common Council's actions to stop the use of portable classrooms against the express advice of the Corporation Counsel and to hold up the construction of West Hertel Middle School were racially motivated. The Superintendent of the schools at the time believed this, and the evidence at trial allowed only that conclusion.

REGENTS AND COMMISSIONER NYQUIST—This court has already considered one request from the Regents and Commissioner Nyquist to amend its April 30, 1976 decision and find them innocent of any racial discrimination with regard to the B.P. S.S.[5] The court declined to do so then, and it declines to do so now.

The Regents and the Commissioner, through their action in the early and mid-1960's, put the B.P.S.S. on notice that segregation must be remedied. Barring a lawsuit, if the Board of Education refused to act, only the Regents and the Commissioner could force their hand. Conversely, if the City officials were reluctant to act, as they proved to be, inaction by State officials could only encourage the City to continue its old ways. The Regents and the Commissioner were well aware of this. Neverthe-

---

5. The court's written opinion was dated December 10, 1976.

less, alleging that they did not bring about the segregation in the B.P.S.S., the Regents and the Commissioner contend that their encouragement and requests that segregation be ended are sufficient to absolve them of liability. This reasoning is fallacious.

In New York State, as this court has explained before, public education is the province of the State Department of Education, which is governed by the Regents and whose chief administrative officer is the Commissioner of Education. Commissioner Nyquist admitted at trial that only action by the Commissioner or by this court could accomplish desegregation of the B.P.S.S. The Regents must have been aware of this also. Certainly they knew that it was a rare day when a school district voluntarily integrated its schools. 415 F.Supp., at 951, n. 48. The Commissioner also testified at trial that the Board of Education's actions "clearly and unequivocally violate the Regents policy." 415 F.Supp., at 958.

It may be, as the Regents and the Commissioner urge, that when state officials have been completely uninvolved with a school district, they should not be held liable for segregation that exists in that school district. But here, the Regents and the Commissioner asserted their authority over the B.P.S.S. and demanded action. Their subsequent failure, over more than a decade's time, to require compliance with their directives served to continue and exacerbate the racial isolation in the Buffalo public schools. The court could only conclude from the Regents' and the Commissioner's actions over this extended time period that, contrary to the lip service they paid integration, they intended that the situation in Buffalo continue unabated. The Regents' continued reliance on their plethora of policy statements urging an end to school segregation is disingenuous. It hardly needs restating that actions speak louder then words.

HOUSING—The housing evidence presented by the plaintiffs was less extensive than the school evidence proper. Much of it dealt with the actions of non-parties. But the conclusion that the Common Council intentionally caused the minority families to be relocated to minority neighborhoods during the Ellicott District redevelopment is supported by the evidence.

As the court noted in its decision, the housing evidence provided an alternative ground for the court's finding of a constitutional violation. It serves the added purpose of providing a more complete historical perspective to the school situation here, and it punctures the popular conception that all minorities either desire to live apart or are forced to by economic circumstance.

Having found that the defendants were guilty of widespread acts of segregation "affecting a substantial portion of the students, schools, teachers, and facilities within the school system," *Keyes v. School District No. 1, supra,* 413 U.S., at 201, [93 S.Ct., at 2694,] this court then applied the *Keyes* standard to find that the B.P.S.S. was segregated.

The foregoing analysis of the case law and of the facts of this case cause this court to reaffirm its April 30, 1976 decision.

The court must now turn to a consideration of the City and State defendants' plans for the September, 1977 school term. The court sets a hearing on the proposed plan for March 14, 1977 at 11:00 a. m. If the schedules of all parties permit, the hearing will continue daily thereafter until completion. At the hearing, the defendants shall have appropriate Board members and staff present to explain the details of the plans submitted and to explain the inability to file more comprehensive plans to integrate the Buffalo schools.

At a prior meeting, the court has already noted some questions concerning the proposed plans, and the plaintiffs have noted certain objections to the proposals. Furthermore, the hearing last June on the initial plans involved a wide range of problems and indicated the parameters within which the defendants must work. At the hearing, the defendants must be prepared to address themselves to these problems.

Each party is requested to inform the court by March 9, 1977 of the witnesses it

expects to call and the estimated length of direct testimony. Any scheduling problems should be called to the court's attention immediately.

So ordered.