**Theodore KIRKLAND, Plaintiff,**

v.

**BUFFALO BOARD OF EDUCATION, Defendant.**

No. Civ–77–295.

United States District Court, W. D. New York.

Oct. 9, 1979.

---

Richard Lipsitz, Lipsitz, Green, Fahringer, Roll, Buffalo, N. Y., for plaintiff.

James J. McLoughlin, Sr., Deputy Corp. Counsel, Buffalo, N. Y., for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.*

In this action, filed June 16, 1977, plaintiff Theodore Kirkland asserts that the Board of Education ("Board") of the City of Buffalo, New York discriminated against him on two separate occasions in employment because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42

---

* Of the Southern District of New York, sitting by designation.

U.S.C. §§ 2000e *et seq.*, and also in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983. Subject matter jurisdiction in this case is founded upon 42 U.S.C. § 2000e–5, whose jurisdictional requirements have been met, and upon 28 U.S.C. § 1343. The case was tried before me without a jury on December 13 and 14, 1978. Post trial briefs have been received and considered.

The proof at trial shows, and I find, that in October 1971 the Board began a search for applicants for a newly created position of Director of Security ("Director") for the Buffalo Public Schools. Advertisements appeared in two local newspapers inviting applications for the position, and approximately twenty persons applied for what was to be a "provisional" appointment, under provisions applicable generally to the classified service under § 65, New York Civil Service Law. Seventeen of these applicants were non-residents of the City of Buffalo. Plaintiff Kirkland did not read the advertisements, nor did he apply for the provisional appointment. Based on a recommendation by the Superintendent of Schools, the Board selected Mr. Wayne Howard, a fully qualified applicant who was a non-resident, and before his appointment secured the City of Buffalo Civil Service Commission's waiver of the City's residence requirement.[1] (PX 6, 8). Mr. Howard was appointed provisionally on November 11, 1971. The record indicates this appointment was based on the excellent qualifications of Mr. Howard as an applicant. There is testimony that suggests that Mr. Howard was told by the Superintendent before he resigned his prior employment, that this appointment was not provisional, but instead was permanent as well as non-competitive. (Tr. p. 214).

In accordance with the New York State Civil Service Law, a competitive examination was scheduled by the Commission to secure a list from which the Board might make a probationary (permanent) appointment to the competitive position of Director of Security. In September, 1972, the examination was posted, with a two year Erie County residency requirement and the stipulation that "Buffalo (City) residents *may* be given preference in appointment." (PX 9). [Emphasis added.] The test was originally planned as a written exercise, though this was later changed, upon request of the Superintendent of Schools, to include an oral examination.

The test was administered in November 1972 and the results show that plaintiff Kirkland, a black male, ranked first, several points ahead of the provisional incumbent, Howard, a white male, and also ahead of Gerald Calvaneso, a white male. These persons were the "top three" from among whom a probationary appointment was required to be made. Certification of such a list makes further employment of a "provisional" appointee unlawful.

On May 23, 1973, the Commission approved an eligible list of these top three candidates for the position, which list was certified to the Board in June, 1973 for purposes of making a probationary appointment, to become permanent after one year of successful service.

The three candidates were interviewed by the Superintendent and by members of the Board, and the recommendation was put forward by Superintendent Reville that Wayne Howard receive the probationary appointment. There had existed an unofficial policy or custom of the Board, for at least seventeen years, that an otherwise satisfactory provisional incumbent would be appointed if he placed either one, two or three on the Civil Service test. This policy was lawful under the state civil service statutes regulating the classified service. Traditionally, an appointing authority, acting under the so-called "one out of three rule" can appoint any one of the top three on a current certified list, and may select among them based on an interview, or even without any articulated basis. The rule represents civil service policy of long stand-

---

1. It turned out that the Commission's city residency requirements, whatever they were, did not extend to appointments by the Board. See discussion, *infra,* pp. 764 and 767. Howard was a resident of Erie County.

ing in New York, in effect since 1883, when the first civil service law was enacted to limit, but not entirely remove, the perceived pernicious effect of the "spoils system" on non-policy-making public employment. The policy to favor a provisional giving satisfactory service had a legitimate purpose: when a new position must be filled prior to an available list, qualified applicants are unlikely to give up existing employment knowing that even if they "pass" the subsequent examination, another person with a higher score (based often on veteran's credit of from 2½ to 10 points added for prior military service—see § 85(2), New York Civil Service Law) is likely to oust them when the time comes to make a probationary appointment. The policy to prefer incumbents played a part in Superintendent Reville's thinking, as did Mr. Howard's successful role in the creation of the school security program and prior, highly satisfactory two-year tenure as a provisional. (Tr. pp. 169–70). Mr. Reville said that residency was not a factor in his decision, that the Board had no policy at the time regarding residency within the limits of the City of Buffalo. Associate Supt. for Personnel Connors confirmed this (Tr. p. 105). The issue of residency will be discussed more fully below.[2] The probationary appointment of Wayne Howard was made on July 18, 1973.

As a result of the hiring of Mr. Howard, plaintiff Kirkland filed a complaint with the New York State Division of Human Rights alleging discrimination. In March, 1974, that Division's report found that "there is no probable cause" to believe that the Board had engaged in discriminatory hiring policies. On August 13, 1973, Mr. Kirkland filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC ultimately determined on June 22, 1976 that "there is reasonable cause to believe that Respondent failed to hire Charging Party because of his color, black." The EEOC found that the Board's "policy of reappointing incumbents would *per se* exclude blacks

from supervisory jobs once they became competitive, since blacks were never placed in such positions provisionally." (PX 46A). When attempts at conciliation failed and the U. S. Department of Justice made the decision not to pursue this case itself, Mr. Kirkland was given a "right to sue" letter on May 16, 1977.

Meanwhile, on September 17, 1973, in the New York State Supreme Court, plaintiff Kirkland sued the Board of Education, the Municipal Civil Service Commission and the City of Buffalo as defendants. He sought declaratory and injunctive relief, as well as an order directing the appointment either of himself, or the third-placed applicant to the position of Director of Security. This action was discontinued under circumstances discussed below.

Following the appointment of Mr. Howard, the Board made two important changes in hiring policy. The first, in 1975, "was to insist that all new members of the Board of Education staff be residents of the City of Buffalo" (Tr. p. 234). Board President Baugh testified about the second:

"[F]ollowing the first appointment of Mr. Howard . . . there was discussion about the one, two, three ranking on the Civil Service list. Following that the board did establish a policy that unless there was some extenuating circumstances or what have you, number one would be the appointee of the board and we no longer look' beyond the first person, unless there was a reasonable reason to do that." (Tr. p. 235).

Implicitly, this policy change eliminated the long-standing practice of appointing the provisional incumbent if he were reachable on the eligible list (Tr. p. 236).

Wayne Howard served in the position of Director until April 23, 1977, when he resigned to take a similar position with the Boston public schools. Superintendent Reville was informed in December of 1976 that Howard was considering such a move, and Howard told him on March 23, 1977 of his definite intention to resign (Tr. II, PP.

2. See *infra*, p. 773.

61–2). Board President Baugh became aware of Howard's physical departure from Buffalo, on accrued leave effective March 23, 1977 (Tr. p. 216).

The Civil Service Commission certified to the Board on May 18, 1977 an eligible list consisting solely of the two remaining names of Kirkland and Calvaneso. On May 12th Mr. Kirkland received a letter from the Superintendent stating that his name "had been" certified for appointment to the Director's position and inquiring whether he would accept the appointment were the offer made. The letter from the Commission certifying the two remaining names noted: "This exhausts the eligible list for this position," and "[a]ppointment must be made on or before May 23, 1977—the expiration date of this eligible list." (PX 34). The consequences of failure to do so would be that a new list would have to be generated by the Commission after a new examination, and an appointment of Kirkland or Calvaneso made after May 23, 1977 would have been provisional only, with service to terminate on the certification of a new list. A time lag of a year or more is not unusual for the promulgation of a competitive examination followed by the certification of a new list. There was of course no assurance that plaintiff or Calvaneso would have placed among the top three on the new list, and be, therefore, reachable for probationary (permanent) appointment.

Mr. Kirkland, on May 16th, notified the Board of his willingness to accept. Interestingly, but apparently by coincidence, it was also on this day that the EEOC gave Mr. Kirkland his "right to sue" letter. Superintendent Reville proposed to the Board on May 25, 1977 the appointment of Mr. Kirkland as one of a large "package" of proposed personnel changes. Mrs. Florence E. Baugh, President of the Board testified that the Board meets on the second and fourth Wednesdays of the month as well as in "conference" (i. e., non-public and unofficial) sessions on the first and third Wednesdays. Between the time of Mr. Howard's resignation on April 23, 1977 and the vote on May 25, 1977 on Mr. Kirkland's appointment, the Board would have had two official or public meetings during which Mr. Kirkland's appointment could have been acted upon. The Board cannot approve personnel changes at conference sessions (Tr. p. 221).

Significantly, the appointment of Mr. Kirkland was discussed at length at a May 18th personnel committee meeting, though no appointment could have been made since it was not a public meeting of the entire Board. According to the minutes of the May 25th meeting, Superintendent Reville told the Board:

"My understanding is that we had a long discussion and there was no vote taken at the [Committee] meeting but there was a long discussion *pro* and *con* about the appointment to this position, and I gave my position which is the same position we gave here—that I would recommend it as a probationary appointment to the Board of Education because Mr. Kirkland was number one on the list and I felt because he was number one on the list he deserves an opportunity to be put in the position to see if he could perform in the position." (PX 36, p. 8).

Mr. Kirkland's appointment, however, was not presented to the Board for approval until May 25th, two days after the Civil Service list which contained his name had expired (PXs 34, 35). The Superintendent proposed that the appointment be made retroactively effective to May 23rd.

There is, of course, no basis in the Civil Service Law for the Board to make a "retroactive" appointment. It is unlawful to pay an employee for days not worked and a probationary or permanent appointment cannot be made from an expired list. As will be seen below, the proposal to appoint "retroactively" was part of a scheme to violate Kirkland's civil rights, on the part of Reville, his subordinates, and legal counsel to the Board, which also violated state law by its intended "retroactivity." Section 56, N.Y. Civil Service Law. The reason for the delay in submitting the appointment, Associate Superintendent for Personnel Connors told the Board that evening, was that:

"On the advice of the Corporation Counsel's office, we did not move until we could get clearance from Mr. Kirkland and his attorney that the [Kirkland New York Supreme Court] case would be dropped. That was the reason for the delay." (PX 36, p. 9).

Indeed, Mr. Kirkland's lawsuit in the state court was "dropped" on May 13th or 14th. I find that directly or through the Corporation Counsel, the Superintendent of Schools successfully "persuaded" Mr. Kirkland and his lawyer to discontinue his suit in state court, as part of the consideration for his appointment, and that solely as a result of official insistence on this corrupt bargain, the appointment had to be delayed until after the civil service list expired. Accordingly, it was necessary to recommend to the Board that the appointment be made "retroactively."

The Board did not perform the bargain made in its behalf by the office of the Superintendent and the counsel. At the May 25th Board meeting Mr. Kirkland's name was singled out from the package and voted on separately; and he was denied the appointment by a vote of six to three. The six white members all voted against Mr. Kirkland, while the three black members of the Board voted for him (PX 36, p. 14).

There were many reasons expressed for the negative vote. Board member Bulera said that he cast his negative vote because the list had expired, because the two name civil service list was "incomplete" and the Board therefore had a duty to "recanvass the city" for possible applicants, and because the proposed use of electronic surveillance equipment under supervision of the Director of Safety might require certain training which Mr. Kirkland did not have. (Tr. II, 6–9). Mr. Kelly also cited many reasons for his negative vote, including the list's expiration and invalidity. He expressed his concern that the appointment would seem like a "deal" for Mr. Kirkland's discontinuing his suit, an appearance to which he objected. In addition, Mr. Kelly testified to his firm belief at the time that management positions with the Board should be "non-contractual." (Tr. II, 22 ff.). Mr. Ryan's negative vote was cast because the list was incomplete, he objected to a retroactive appointment, he thought the job was overpaid, and he did not think the position should be filled at all. Mr. Ryan was also concerned that the appointment would be an "admission of guilt" by the Board regarding Mr. Kirkland's lawsuit, and it appeared to him this appointment was an effort by the Superintendent to settle the state court suit through the award of a job. (Tr. p. 255 ff.). On this latter point at least, Mr. Ryan's perception is the same as that of this Court, and fully justified by the testimony at trial, and the contemporaneous exhibits. Board President Baugh recalled that discussion at the May 25th meeting "was around the fact that there was a case pending against the Board by Mr. Kirkland because of the first round." (Tr. p. 225). This, despite defendant's contention that "[t]he discontinuance of the plaintiff's Supreme Court action would not seem to have concerned any Board members." (Def. Post-Trial Brief, p. 27). The testimony concerning the May 25th meeting given by those Board members who appeared at trial is found to be truthful, and it is corroborated substantially by the contemporaneous exhibits.

Following the effective date of Mr. Howard's resignation, Superintendent Reville by administrative fiat of some sort had upgraded a subordinate security officer to fill the Director's position at the authorized salary. Apparently the City Civil Service Commission acquiesced in this improper personnel practice and the Board apparently did not insist on its right to effect this salary or personnel change. That officer, Mr. Lepir, held the title of "Acting" Director of Security and received the Director's authorized level of salary for over four months, until about September 5, 1977, when a black security officer, Mr. Cunningham, was installed by Reville jointly with Mr. Lepir, to serve as "Acting Co-Director" of Security.

As noted earlier, on June 16, 1977, plaintiff Kirkland commenced the present law-

suit. Two weeks later, on July 1, 1977, the Board deleted the Director of Security position as a line-item in the budget for fiscal year 1978 (i. e., July 1, 1977 to June 30, 1978). However, as noted above, despite the deletion of this job title, the Superintendent continued until September, 1977 to fund Mr. Lepir from the general security budget in the Director position, and then split the Director salary between Mr. Lepir and Mr. Cunningham. This continued through the date of trial, although the job title was changed at some point to "Supervisor" of Security, certainly a change of form but not substance.

It is on these two instances of hiring, the first in 1973 and the second in 1977, that plaintiff bases his claims of discrimination in violation of 42 U.S.C. § 2000e *et seq.* There is no violation in the first instance, though an intentional violation of Title VII in the second.

Alternatively, plaintiff pleads violations of 42 U.S.C. § 1983. Insofar as concerns § 1983 liability arising out of the events in 1973 when he was by-passed for probationary appointment in favor of Wayne Howard, this separate jurisdictional basis depends on the same facts. Applicability of § 1983 to the events of 1977 is discussed *infra*, p. 773. Defendant's contention that the § 1983 claims are time barred in whole or in part is rejected. *Tomanio v. Board of Regents,* 603 F.2d 255 (2d Cir. 1979) cert. granted 444 U.S. 939, 100 S.Ct. 291, 62 L.Ed.2d 305.

The Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 provides that:

"(a) It shall be an unlawful practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .."

Plaintiff argues that defendant Board violated this section by its refusal to appoint him Director of Security in 1973, instead appointing Howard, a white, nonresident, applicant who had scored below plaintiff on the Civil Service examination. More broadly, plaintiff asserts that the Board's apparent custom and practice of reappointing incumbents if reachable on the list (*i. e.,* one of the top three), discriminates against blacks, solely for the reason that they were historically seldom appointed to provisional positions by the Board. Here, plaintiff of necessity relies on the "disparate impact" theory of *Griggs v. Duke Power,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970). This theory concerns a racially neutral hiring test or practice that has an ultimately disproportionate impact or effect on a particular group or minority.

Plaintiff asserts initially that defendant Board's hiring of a nonresident as a provisional appointee and then rehiring him as a permanent employee despite the presence of a higher scoring City of Buffalo resident is indicative of defendant's willingness to violate rules to avoid hiring a black. However, this Court finds no violation of Buffalo's residency rules as they existed in 1971–1973 in the hiring of Mr. Howard, nor was the practice shown to be a subterfuge for practicing employment discrimination after March 24, 1972 when the Board came under the statute.[3] After that date, and prior to abolition of that policy, there were too few provisional appointments made in classified positions to support an inference of discrimination based solely on statistics or numbers, and there is no evidence of the statistical make-up of the groups of applicants responding to advertisements to fill provisional appointments.

A detailed analysis of the residency laws prepared by the City's Corporation Counsel for the Buffalo Common Council included an evaluation of § 23(4–a), New York Civil Service Law, which provides that an ap-

---

**3.** In 1972, Congress amended 42 U.S.C. § 2000e(a) to include "political subdivisions" within the purview of the statute, effective March 24, 1972 for the first time. Since the Board did not fall within the scope of Title VII until that date, no adverse inference of generally unlawful conduct follows from events preceding that date.

pointing authority *may* require residency for competitive positions. The study contained the conclusion: "The teaching and non-teaching employees of the Board of Education are exempt from the residency requirements in the absence of a by-law which requires residency of such personnel." (PX 46, B–9 (Q)(1). Significantly, this study predates the instant controversy by years. There is no evidence that any applicable by-law had been adopted prior to the hiring of Mr. Howard. Further, the Commission waived any such requirement as it applied to the taking of the Civil Service examination (PX 25) (if indeed it did apply), and advised the Board that such requirement did *not* apply to the ultimate, permanent appointment. The question of residency or waiver of residency is not relevant to the issues here.

■ Plaintiff submitted statistics regarding defendant Board's hiring practices and the population of the City of Buffalo. These statistics demonstrate that there is a low percentage of minority staff employed by the Board, and these figures are certainly relevant. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1977). They are not, however, determinative. For example, statistics may not illustrate adequately a recent favorable trend. See, *EEOC v. Local 14, International Union of Operating Engineers*, 553 F.2d 251 (2d Cir. 1971) or they may be entitled to no weight because of reliance on a sample size which is too small. See, *Teamsters v. United States*, 431 U.S. 324, 339–40, n. 20, 97 S.Ct. 1843, 1856–57, 52 L.Ed.2d 396 (1976).

■ The statistics derived from stipulations in the case *Arthur v. Nyquist*, 415 F.Supp. 904 (W.D.N.Y.1976); aff'd. as to Buffalo defendants, rev'd. as to New York State defendants, 573 F.2d 134 (2d Cir. 1978), demonstrate that the non-white student population in Buffalo is very high, 46% in 1973–74, and the non-white portion of the staff, most of which was hired before 1972, is low, approximately 11% in 1972–73 (PX 15a). These figures, however, are not persuasive here. Hiring practices before 1972 are of no relevance in this case, nor are instances of instructional-staff hiring, as the case at bar is concerned exclusively with non-instructional, competitive positions in the classified Civil Service. As to instructional staff there is great latitude in recruiting; appointments in the classified service must be made from the top three on a list certified by others.

■ Plaintiff also relies on a list prepared for the EEOC investigation of this case showing the racial breakdown of twenty-two supervisory positions comparable in authority to that of the Director of Security. The conclusion is that only one of these twenty-two is held by a black. (PX 17). This circumstance is entitled to slight weight. Of the twenty-two persons, only four were appointed since 1972. Further, Associate Superintendent for Personnel Connors testified that of the twenty-one positions held by whites, in each hiring instance except one, the top three candidates certified by the Commission were all white; expressed differently, of sixty-three candidates certified and reachable on the lists, only one was non-white. Thus, the range of choice available to the Board was severely limited to the point of being almost nonexistent. The statute does not require affirmative action on the part of an employer except where a violation has been shown. See, *Furnco, supra*, 438 U.S. at 577, 98 S.Ct. at 2949. It merely proscribes employment decisions based on race instead of merit. Indeed, Title VII

"expressly protects the employer's right to insist that any prospective applicant, Negro or White, must meet the applicable job qualifications. Indeed, the very purpose of Title VII is to promote hiring on the basis of job qualifications, rather than on the basis of color." Sponsors' Bill Memo., 110 Cong.Rec. 7247, quoted in *Griggs, supra*, 401 U.S. at 434, 91 S.Ct. at 855.

Plaintiff does not suggest that Mr. Howard was unqualified.

■ Plaintiff points to a list of non-instructional provisional appointments since 1972 as illustrative of defendant Board's

claimed discriminatory appointment practices. This list, however, applying to appointments not necessarily supervisory in nature, shows that since 1972 twelve of thirty-six provisional appointees have been minority members. This is a favorable trend, and if continued, would lead to a ratio exceeding the 21% minority staff required by *Arthur v. Nyquist*, Civ–72–325 (March 26, 1979 W.D.N.Y.). However, this case does not present for resolution the issues of *Arthur*, which are under the ongoing scrutiny of Chief Judge Curtin of this District. See also, *Arthur v. Nyquist*, 429 F.Supp. 206 (W.D.N.Y.1977), *aff'd*. 573 F.2d 134 (2d Cir. 1978); *Arthur v. Nyquist*, 415 F.Supp. 904 (W.D.N.Y.1976). While there can be no question that the Buffalo Public School System has been found to have been a segregated school system, that finding, based almost entirely on student and teacher assignment and hiring of *instructional* staff, much of it prior to 1972, cannot automatically be carried over to the present case of appointments in a competitive civil service classification.

■ The statistics demonstrate at most that the percentage of minority staff, many employed prior to 1972, at the supervisory level is low. Under *Griggs* this is sufficient evidence to make out a rebuttable presumption of a discriminatory practice. See, *Furnco, supra*, 438 U.S. at 583, 98 S.Ct. at 2952 (partial concurrence of Marshall, J.). However, once this is accomplished, the burden of persuasion shifts to the defendant to show the practice has "a manifest relationship to the employment in question." *Griggs, supra*, 401 U.S. at 432, 91 S.Ct. at 854. As explained by the Court in that case:

"The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices. . . . Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. . . . Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification. . . . The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. *The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.*" *Griggs, supra*, at 429–31, 91 S.Ct. at 853 (emphasis added).

■ The practice challenged in the first claim pleaded is the now abandoned custom of the Board in appointing provisional appointees if reachable on the Civil Service list and serving satisfactorily. The methods of operation—recruitment, advertising and testing—of the Buffalo City Civil Service Commission are not questioned today, nor is that Commission a defendant in this case. Thus, the Board's policy, which dates back seventeen or eighteen years, must be viewed against the background of the certification process, whereby the appointing authority may select any one of the three candidates certified by the Commission as eligible, the "one-out-of-three" rule. See, New York Civil Service Law § 61, Memo. on 1958 Revision, 9 McKinney's 187. When viewed in this light, it cannot be said that the practice of appointing a satisfactory provisional incumbent who has scored in the top three on the Civil Service examination is an "artificial, arbitrary and unnecessary" barrier to employment. Rather, it is apparently related in a direct way to successful job performance. Superintendent Reville explained his reasons for selecting Mr. Howard:

"Wayne Howard formed the [security] program, put together the security program and this was new . . . . [H]e was a very capable administrator. He had done a good job . . . and our practice was to select an incumbent in the position if he got within the first three on the list, but more importantly, Mr. Howard was a very able administrator." (Tr. pp. 169–70).

This Court finds that the practice complained of is not discriminatory *per se*, and the civil rights of plaintiff Kirkland as protected by Title VII were not violated by its operation in his case.

■ Plaintiff's second claim pleaded stems from the Board's refusal to hire him in 1977, upon Mr. Howard's resignation. In order to make out a successful case of Title VII discrimination, a plaintiff carries under the disparate treatment approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972) "the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act'." *Furnco, supra* 438 U.S. at 576, 98 S.Ct. at 2949, citing 431 U.S. at 358, 97 S.Ct. at 1866.

*McDonnell Douglas* spells out the formula for a *prima facie* case of discrimination. A plaintiff must show that he is a member of a

> "racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas, supra*, at 802, 93 S.Ct. at 1824.

Plaintiff meets the first three criteria, but by the nature of the facts the fourth cannot be met. Contrary to defendant's assertion, however, this is no bar to a *prima facie* showing, for *McDonnell Douglas* is not a rigid formulation, but recognition that a Title VII plaintiff carries the initial burden of offering evidence sufficient "to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Teamsters, supra*, 431 U.S. at 358, 97 S.Ct. at 1866; *McDonnell Douglas, supra*, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824.

■ Defendant's failure to fill the Director of Security position with an official appointee, and its evasive act in permitting the Superintendent to upgrade two security officers to perform the functions of the Director, satisfies plaintiff's burden.[4] Once this prima facie case is made, the "burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection." *McDonnell Douglas, supra,* at 802, 93 S.Ct. at 1824. In this case, defendant Board has put forward several reasons which it hopes will be sufficient to explain Mr. Kirkland's second rejection and its subsequent actions.

Defendant relies heavily on the fact that the Civil Service eligible list expired on May 23, 1977, two days prior to the vote, claiming that it was therefore precluded from making the appointment. It is true that § 56 of the New York Civil Service law provides that a list shall not last more than four years; however, the expiration of the list was due to the intentional acts of the Board's agents. As stated earlier, between the time of Mr. Howard's resignation and the May 25th vote, the Board's schedule called for two regular meetings and two conference sessions, one of which was a personnel committee meeting at which Mr. Kirkland's appointment was discussed at length. Superintendent Reville was aware by May 18th, if not sooner, that the appointment had to be made by May 23rd because of the list's expiration (PX 34). In any case, he was aware as far back as December of the previous year that Mr. Howard had visited Boston to interview for a new position there. (Tr. II, p. 61). That under these circumstances an appointment

---

4. See *supra*, p. 766.

should not be recommended to the Board for approval until two days after the expiration of the list is highly suspect.

Indeed, upon the record, the reason for the delay is clear. As stated by Associate Superintendent for Personnel Connors at the May 25th meeting:

"On the advice of the Corporation Counsel's office, we did not move until he could get clearance from Mr. Kirkland and his attorney that the [New York Supreme Court] case would be dropped. That was the reason for the delay." (PX 36, p. 9).

The delay was caused by the acts of the Board's agents, the Superintendent and Associate Superintendent of Schools, acting in concert with or at the request of the Corporation Counsel, whose office represents the Board. The principle excuse offered for the defendant's rejection of Mr. Kirkland, then, that it could not appoint him due to the expiration of the list, while a valid excuse, is of the defendant's own creation, and one that came into existence solely as a result of actions of the Board and its agents. These actions, as discussed below, had an improper motive which violated the federal statute. Accordingly, the Board cannot rely on the expiration of the list as a legitimate reason for rejecting plaintiff.

The other reasons offered by defendant fare no better and appear to be pretextual. Defendant Board suggests it intended to eliminate the position of Director of Security both for budgetary and efficiency reasons. Mr. Lepir, the security officer who was upgraded, replacing Mr. Howard for over four months, received the assigned salary for a Director of Security and performed the same functions. Indeed, it appears that the position was never eliminated, but merely renamed. On September 9, 1977, Mr. Cunningham, a black, was promoted to work with Mr. Lepir as "Acting Co-Director" of Security, a job they each held through the date of trial. They each served on a rotating basis so that during half the time each enjoyed the pay scale applicable to the Director of Security. Mr. Lepir stated that "at all times both of us

have been in the office performing the duties" of the Director of Security. There is at least a suggestion in the record that Mr. Cunningham was appointed as co-director because of a *greater* workload. By stipulation, it is clear that the official title of *Director of Security was not eliminated* until February 8, 1978, eight months after Mr. Kirkland's rejection.

Defendant further asserts that since the list certified to it by the Civil Service Commission was incomplete, having less than three names on it, the Board was not *obliged* to resort to it in selecting a new Director. The Civil Service law permits, but does not require, that the appointing authority insist on appointing from a list having at least three names. This conclusion follows from a reading of the relevant sections of the statute. Section 23(4) provides that "such list shall continue to be used until superseded . . . or until such list expires or is exhausted or is otherwise terminated." However, § 61(1) provides for "selection of one of the three persons certified . . . .." The legislative history and almost a century of experience with the concept teaches that § 61(1) is directed to priority among eligibles, allowing the appointing power the flexibility to select any one of the top three rather than the highest scoring applicant, but is not directed to the issue of the continued use of an eligibility list with less than three names, which is permissive but not mandatory. *Hurley v. Board of Education*, 270 N.Y. 275, 280, 200 N.E.2d 818, 820 (1936); *Bailey v. Kern*, 177 Misc. 904, 32 N.Y.S.2d 386 (Sup.Ct., N.Y.Co., 1942); *Reiser v. State of New York*, 198 Misc. 647, 98 N.Y.S.2d 705 (Ct.Cl.1950).

At the May 25th meeting, the Board was told by the Superintendent and the Associate Superintendent for Personnel that its general policy or custom was to use a list until exhausted of names. When questioned, Superintendent Reville advised:

"MR. REVILLE: Mr. Connors and I talked it over, as well as Mr. Murray. I asked Mr. Connors a number of questions about it. The first question I asked is:

do you appoint if a list is near the end and there are two people left on it—do we drop the list or do we appoint the number one from the list? I'll ask him again. What is our custom—what is our policy on that, Mr. Connors?

MR. CONNORS: The Board's general practice is to continue using a list until it is completely exhausted.

MR. REVILLE: So in this particular case when we went to the list and selected the number one person, was that the procedure we normally follow?

MR. CONNORS: That's correct. . . .

CHAIRWOMAN BAUGH: Has it been the policy of the Board to do what you just outlined, Mr. Connors—to go back to the list and canvass the list and take the number one off that list if a vacancy occurs?

MR. CONNORS: Yes, that was a question that I answered as posed by the Superintendent, that even though there are only two names on the list or even one name, it has been Board practice if that person was felt competent that they [sic] would be recommended to the Board for approval." (PX 36, pp. 7–8).

Board President Baugh testified that following Mr. Kirkland's first rejection the Board had explicitly adopted the policy of selecting the highest scoring person from an eligible list. Defendant concedes that "Mr. Connors' statement as to the policy of exhausting the list was probably correct . . ." (Defendant's Brief at 26). Thus the Board's defense of its rejection of Mr. Kirkland on the premise that it was not proper to select from a Civil Service list having less than three must be regarded as pretextual.

Throughout the May 25th meeting there was discussion of Mr. Kirkland's pending EEOC complaint and the pending state lawsuit arising out of his initial rejection by the Board. Board member Ryan testified that one of the reasons he voted against appointing Mr. Kirkland was because:

"[T]here were statements made with regard to litigation involving this particular appointee, both a State Supreme Court lawsuit and there was this mention of a Federal lawsuit [sic, actually an EEOC complaint which was a necessary prerequisite for a federal lawsuit] under an EEOC complaint and it seemed as though offering this job was in some way possibly being tied into a settlement of one of these lawsuits, and it also gave me concern that the appointment might in some way be an admission of guilt on the board's part with respect to the other lawsuit which was apparently still pending."

Title VII, 42 U.S.C. § 2000e–3(a), makes it an unlawful employment practice:

"for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

▮ I find that Mr. Kirkland was denied the second appointment because the list expired before a recommendation to appoint him was submitted to the Board, and that delay in submitting the recommendation occurred solely because of the elapsed time required to demand, unlawfully, and to receive, a withdrawal of protected complaints of discrimination. However natural it may be for an employer to be reluctant to hire someone who has brought suit against him, it is every citizen's right to resort to the judicial system, and Title VII makes illegal an employment decision based on applicant's exercise of this right as it applies to actual or perceived employment discrimination. Essentially, this is retaliation, and the methods and burdens of proof of a Title VII retaliation case are substantially the same as in any other employment discrimination case. *EEOC v. Local 14 and 15, International Union of Operating Engineers*, 438 F.Supp. 876, 887 (S.D.N.Y.) *rev'd. in part on other grounds*, 553 F.2d 251 (2d Cir. 1977). The elements of such a case are:

"(1) protected participation or opposition under Title VII known by the retaliator;

(2) an employment action or actions disadvantaging a person or persons engaging in protected activi[ty]; and

(3) a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions." *Id.* at 881.

■ In the words of Associate Superintendent Connors, speaking to the Board, "we did not move until [the Corporation Counsel] could get clearance from Mr. Kirkland and his attorney that the case would be dropped. That was the reason for the delay." (PX 36, p. 9). Under the circumstances of this case, the Board is liable for the improper activities of its agents under the doctrine of *respondeat superior.* For the reasons stated, I find a violation of 42 U.S.C. § 2000e–3(a) arising out of the events of May 1977.

■ To the extent that plaintiff seeks recovery arising out of the same events of May 1977 under 42 U.S.C. § 1983, no liability attaches to the Board. There is no evidence that the Board itself caused any damage to Mr. Kirkland directly by its own actions. By the time it acted, the Civil Service list had expired, and no valid appointment could have been made. The proximate cause rather was the actions of the Board's agents, committed prior to May 25, 1977. These agents were not sued in this action. *Respondeat superior* will not apply to a § 1983 claim under the facts of this case. See, *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ Plaintiff's complaint seeks a mandatory injunction placing him in the position of Director of Security and also seeks to enjoin defendant Board from continuing an alleged policy and practice of excluding blacks from appointment to non-teaching supervisory positions. The latter relief, pursuant to 42 U.S.C. § 2000e–5(g), is inappropriate in this case as there has been no proof or finding of a pattern or practice of discrimination. This was an isolated violation of Title VII, § 2000e–3(a) which does not portend a recurrence. In addition, plaintiff's career has taken a different route, his subsequent success in another field making such mandatory appointment of no benefit to him.

■ Plaintiff also seeks back pay. As no violation is found of Title VII in connection with the probationary appointment of Mr. Howard in 1973, there will be no award of damages for the period of Howard's tenure. Back pay will be computed and awarded from April 23, 1977, the effective date of the job vacancy created by Howard's resignation, to May 25, 1978, the date on which plaintiff accepted a higher paid position as a New York State Commissioner of Parole. Had plaintiff served as Director during that period he would have earned an annual salary of $16,885 (pay grade 21, step 1) until July 1, 1977, when a new pay scale raised the annual rate to $17,561 per year. Plaintiff's Exhibit 35 shows that the original proposal to appoint Kirkland was at step 1 of pay grade 21, although Howard, who had by that time approximately 5½ years seniority, was apparently serving at step 3 of pay grade 21.

His earnings during the balance of the calendar year 1977 therefore would have been $12,027. In accordance with § 2000e–5(g), plaintiff's interim earnings shall be set off against back pay recoverable. During the period from April 23, 1977 through December 31, 1977, plaintiff, whose annual salary as a patrolman for the City of Buffalo was $15,975, earned $11,059. Accordingly, plaintiff's damages for the calendar year 1977 are computed at $968.00. The parties stipulated that Mr. Kirkland's earnings from the City of Buffalo for 1978 amounted to $8,421 for the period ending May 25, 1978. This figure is unexplained, but it probably contains extra compensation for overtime and court appearances, since Mr. Kirkland testified that the police department received only a 7% pay raise in 1978. During 1978 Mr. Kirkland earned more as a patrolman, in accordance with the stipulation, than a Director of Security in pay grade 21, step 1, which I find is the position he would have been appointed to in accordance with plaintiff's Exhibit 35. Accord-

ingly, he suffered no monetary damages for 1978.

The statute, § 2000e–5(k), authorizes the court in its discretion to allow the prevailing party reasonable attorney's fees as part of the costs. The Senate Report for the Civil Rights Attorney's Fees Awards Act of 1976 states the policy behind such awards:

"All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which the laws contain. . . . If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court." S.Rep. No. 94–1011, 94th Cong. 2d Sess. 1 (1976), *reprinted in* [1976] U.S. Code Cong. and Admin. News, pp. 5908, 5910, *quoted in Zarcone v. Perry*, 581 F.2d 1039, 1041 (2d Cir. 1978).

■ Some of the factors that may be taken into account in determining an award of attorney's fees are:

"the size of the benefits conferred by the suit on the public or on others, the amount of any fund created by the litigation (and its adequacy to cover the plaintiffs' costs and compensate him for actual damages), the presence or absence of any bad faith or obdurate conduct on the part of either party, and any unjust hardship that a grant or denial of feeshifting might impose." *Zarcone, supra* at 1044.

In the present case an award of attorney's fees is appropriate, and after consideration of all of the factors listed above, particularly the type and extent of the violation, and the extent of skill and effort required of counsel, plaintiff's request for attorney's fees is granted in the amount of $12,582.00, inclusive of disbursements and costs. The Court has accepted Mr. Kirkpatrick's affidavit filed February 16, 1979 as a valid appraisal of the reasonable value of the services rendered, but has excluded those services rendered prior to April 23, 1977 when Howard's resignation occurred, giving rise to the claim upon which plaintiff has prevailed. The fees may seem large in comparison to the net damages; this is so only because plaintiff discharged his legal duty to mitigate his lost wages by continuing in a comparably paid city employment. The principles vindicated here have an importance far beyond that of the net or gross wage loss, and this Court has given little weight to the amount recovered in fixing the fee.

The foregoing constitutes the findings and conclusions of the Court after trial pursuant to Rule 52, F.R.Civ.P. The Clerk of the Court shall enter judgment in favor of plaintiff and against defendant, pursuant to Rule 58, F.R.Civ.P. in the amount of $13,500.00, with interest on $968.00 at six (6) per cent per annum from December 31, 1977 to date of the judgment.